780 A.2d 1154

STATE ETHICS COMMISSION

v.

Robert J. ANTONETTI, Sr.

No. 111, Sept. Term, 2000.

Court of Appeals of Maryland.

Sept. 11, 2001.

430

432

Randolph Stuart Sergent, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

William C. Brennan, Jr. (Brent M. Ahalt of Knight, Manzi, Nussbaum & LaPlaca, P.A., on brief), Upper Marlboro, for respondent.

Anne L. Blumenberg, Alan T.L. Sun, Community Law Center, Inc., Baltimore, on brief of Amicus Curiae in support of the respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

BATTAGLIA, Judge.

In the appeal now before us, we must consider whether Robert J. Antonetti, Sr., who served as the Administrator for the Prince George's County Board of Supervisors of Elections violated the provisions of the Public Ethics Law, Md.Code Ann., State Gov't § 15-101 et seq. (1984, 1995 Repl.Vol.),[1] by recruiting, hiring, promoting and supervising his wife and minor children in temporary employment positions spanning a six year period with the Petitioner, the Prince George's County Board of Supervisors of Elections.

---

1. For purposes of our analysis under the facts of this case, we apply the recodified version of the Public Ethics Law in effect in 1995. The State Ethics Commission filed its complaint against Antonetti on September 25, 1995, alleging violations which occurred between 1988 and 1994. The comparable provisions of the Public Ethics Law were enacted by 1979 Md. Laws ch. 513 and originally codified at Md. Ann.Code, art. 40A § 1-102 et seq. (1957, 1979 Repl.Vol.). The statute was subsequently amended without substantive change by chapter 533 of the 1995 Maryland Laws, which transferred the Public Ethics Law to the State Government Article of the Maryland Code.

## I. Facts

The Respondent, Robert J. Antonetti, Sr. ("Antonetti"), served as the Administrator for the Prince George's County Board of Supervisors of Elections ("the Board") for thirty years, starting on January 5, 1970. The duties of the Elections Administrator in Prince George's County have been defined formally in the county's "Position Description Performance Standards" as:

> Chief Executive Officer of and principal advisor to the Board of Supervisors of Elections which regulates all Federal, State and County elections. The Elections Administrator's primary responsibility is one of management, planning, developing and administering the fiscal functions and general activities of the office of the Board of Supervisors of Elections combining a knowledge of election technology and law with administrative skills. Work is performed with independent judgment within the established policies of the Board and dictates of Federal, State and County law. . . . An employee in this class counsels and evaluates the work of all employees, elects, assigns and directs the training programs for Board employees including technical, clerical and temporary personnel.[2]

In Antonetti's eighteenth year as Elections Administrator, members of his family, including his wife and children, began to work in a number of positions for the Board. Antonetti's wife, Mary Catherine Antonetti, worked for the Board in 1988, 1992 and 1994 as an election clerk. Antonetti signed the supplemental pay authorization form permitting Mrs. Antonetti to become a temporary employee of the Board and establishing her rate of pay.[3] In 1994, Antonetti executed a subse-

---

**2.** This language was taken from a copy of the "Position Description Performance Standards" form signed by Robert J. Antonetti, Sr. on September 7, 1984 and produced as an exhibit at the hearing before the Commission.

**3.** At the hearing before the Commission, John Walter Douglas, who served as the county auditor for the Office of Audits and Investigations

quent form authorizing a pay increase for his wife. Mrs. Antonetti was paid $7.00 per hour in 1988 for a total of $234.50, $7.00 per hour in 1990 for a total of $514.50, and $10.00 per hour in 1994 for a total of $530.00.

Antonetti's eldest son, Robert J. Antonetti, Jr. ("Robert, Jr.") began working at eleven years of age for the Board in 1988 as a book runner, carrying books, supplies, and other election materials to election judges. Antonetti signed a supplemental pay authorization for Robert, Jr. in 1988 at an hourly pay rate of $6.25. In 1990, Antonetti executed another supplemental pay authorization increasing Robert, Jr.'s salary to $7.00 per hour. As a book runner, Robert, Jr. earned $84.38 in 1988 and $105.00 in 1990.

In 1992 when Robert, Jr. was sixteen, he became a Voting Machine Technician. At that time, there were no other individuals under the age of eighteen who were employed as voting machine technicians with the Board. In this capacity, Robert, Jr. programmed, tested and performed maintenance on the Prince George's County voting machines. For this, Antonetti signed a supplemental pay authorization form enabling his son's employment as Voting Machine Technician I at $8.00 per hour. In 1992, Robert, Jr. earned a total of $2,048.50 for his work in this position. In 1993, Antonetti executed a supplemental pay authorization which promoted Robert, Jr. to the position of Voting Machine Technician II, for which Robert, Jr. was paid $10.00 per hour.[4] Robert, Jr.

---

of Prince George's County, explained that when an agency head signs a supplemental pay authorization form it allows the agency to hire someone directly without going through the paperwork and procedures of the Office of Personnel of Prince George's County. He testified that the Office of Audits disfavored the use of the supplemental pay authorization forms.

4. According to the information provided on the Supplemental Pay Authorization form authorizing his employment as a Voting Machine Technician I, the following requirements must be met in order to receive a promotion to Voting Machine Technician II:

After a satisfactory period, including at least two county elections, the incumbant may be eligible for promotion to Voting Machine Technician II upon recommendation of the Voting Machine Consultant to

earned $1,266.00 in this position in 1993, and $4,275.00 in 1994. Robert, Jr. continued his employment with the Board as a Voting Machine Technician II in 1995 and 1996.

In 1988, Antonetti's second son, John Paul Antonetti ("John"), began his employment with the Board at the age of nine as a book runner, just like his brother, Robert, Jr. He continued working in this position during the 1990, 1992, and 1994 elections. Antonetti executed a supplemental pay authorization form for John in 1988 establishing an hourly pay rate of $6.25. On two subsequent occasions, Antonetti executed additional supplemental pay authorization forms, increasing John's salary to $7.00 per hour in 1990 and $10.00 per hour in 1992 for the same tasks he performed as a nine year-old. John earned a total of $84.38 in 1988, $105.00 in 1990, $159.50 in 1992, and $150.00 in 1994.

Antonetti's youngest son, Edward James Antonetti ("Edward") began working as a book runner for the Board in 1992 when he was eleven and continued to do so in 1994. Antonetti executed a supplemental pay authorization for Edward in 1992, setting his pay rate at $10.00 per hour. Edward earned a total of $150.00 in 1992, and $140.00 in 1994.

In 1990, Antonetti's daughter, Theresa Caroline Antonetti ("Theresa") began working for the Board at the age of fifteen as summer help in the Board office. She earned a total of $241.50 at a pay rate of $7.00 per hour in 1990, $1,827.00 in 1992 and $1,998.50 in 1994. Antonetti executed the supplemental pay authorization forms for Theresa's employment.

Antonetti signed all of the time sheets for his wife and offspring as their supervisor. For the period of 1988 through 1994, Antonetti's family members earned a total of $13,913.76 as employees of the Board.

---

the Elections Administrator. However, *no promotion may be considered unless the incumbent has completed the course of training provided by AVM Corporation or its equivalent.* (emphasis in original). At the time of his promotion, Robert, Jr. had not participated in two county elections or in a training course. His only experience had been through working as a Voting Machine Technician I in 1992.

On September 25, 1995, the State Ethics Commission ("the Commission") issued a complaint against Antonetti, stating that in his capacity as Administrator for the Board of Supervisors of Elections of Prince George's County, Antonetti was "a public official of the State subject to the conflict of interest and the financial disclosure provisions of the Ethics Law." The complaint alleged Antonetti had violated the Public Ethics Law in that he had:

1. Participated in his official capacity in the hiring of his wife and children for part time and temporary positions with the Board of Supervisors of Elections of Prince George's County in violation of Sections 3–101(a) and 3–104 of the Ethics Law; and

2. Failed to timely disclose the employment of his wife and dependent children on his annual financial disclosure statements for calendar years 1988 through 1994 in violation of Section 4–103 of the Ethics Law.[5]

The alleged violations covered the period of time from 1988 through 1994 and involved Antonetti's recruitment of his family members to fill positions with the Board, enabling their employment by signing the supplemental pay authorization forms, supervising them by authorizing payment for their work, promoting Robert, Jr. to Voting Technician II, a position for which he had not qualified, increasing their salaries without requiring additional work performance and for failing to disclose the employment activities of his family members on his annual financial disclosure statements as required by Subtitle 6 of the Ethics Law.

A hearing was held before the Commission on January 21, 1997 at which time the Commission made the following findings of fact:

1. Respondent is now and was at the times relevant to this complaint employed as Elections Administrator for the Prince George's County Board of Supervisors of Elec-

---

5. Citations in the Complaint are to Md. Ann.Code Art. 40A (1957, 1990 Repl.Vol.).

tions (the Board). In this capacity he serves as the Chief Executive Officer and principal advisor to the Board in regulation and administration of all Federal, State and County elections in the County. The position is one of management, planning, developing and administering the fiscal and general activities of the agency, and entails performance of duties with independent judgment within the established policies of the Board and Federal, State and County law. The position involves substantial responsibilities relating to direction and supervision of Board employees as required to carry out elections in the County.

2. Though responsibility for final budget development is vested in the Board and ultimately the County government, we find that Respondent plays a key advisory role in budget development, including recommending numbers and types of employees and rates of pay. The Board relies substantially on the initial budget proposed by Respondent, seldom changing pay rates or numbers of positions. Moreover, it is clear from the record that Respondent's key operational responsibilities for managing the Board's program and activities involve substantial judgment and discretion in filling positions authorized by the Board in its budget development process. Witnesses testified that the Board was "kept aware" of persons hired by Respondent, was "notified" of hirings, or was given a list of recommendations. It is clear to us from the record that wherever the technical legal hiring authority lay, this is a citizen board that relies substantially on the efforts and recommendations of its full-time professional staff administrator to make hiring decisions, and that he in fact functions in this capacity.

3. During the period of time relevant to this complaint (1988 to 1994), Respondent in his official capacity as Elections Administrator took many actions involving his spouse Mary Antonetti and his four children (Robert, Jr., Teresa [sic], Edward, and John), all of whom were,

at most times involved in this matter, minor children. These actions involved signatures on no fewer than 11 Supplemental Pay Authorizations, 4 Employment Eligibility Verifications, and 36 Time Sheets. The Supplemental Pay Authorizations were the key hiring documents, attesting to the employment of individuals with the Board and authorizing the agency to compensate them for services. The Eligibility Verifications were essential legal documents reflecting a finding by the Respondent on behalf of the agency that individuals met Federal citizenship requirements and were eligible to be employed by the Board. The Time Sheets were the key fiscal documents allowing the County payroll authorities to issue checks compensating individuals for work performed as set forth in the document. The testimony in this matter was that these documents were essential for payment to be made and that they could be signed only by the Respondent. It was stated that without Respondent's signature, an individual would not be paid.

4. As set forth in paragraph 3 above, these actions involved the Respondent's spouse and four minor children. All of these documents established or implemented an employment relationship between these members of Respondent's immediate family and his agency, the Board, and all were undertaken with the anticipation that the individuals would receive compensation for this employment and would in fact receive economic benefits from the transaction. The record clearly shows that these individuals were compensated and did in fact benefit economically as a result of Respondent's actions.

5. The record also indicates that Respondent on more than one occasion, in his official capacity recruited individuals who were his relatives or took actions designed to result in an employment relationship between them and the agency, which was intended to benefit them economically. Testimony by Respondent's spouse and at least one of his sons was that "my husband" or "my father" suggested their employment with the Board. Lists were generated and included in the record that include

Respondent's relatives' names as recommended by him for employment, and on one occasion minutes of the Board meeting reflect a recommendation by Respondent for the employment by the Board of his daughter Teresa [sic] (then an adult).

6. According to Time Sheet documents and testimony in the record, Respondent's now-adult son Robert, Jr. continued as recently as Summer 1996 to be employed by the Board as a voting machine technician. Though the record reflects his direct supervision primarily by Sam McAfee, another senior employee in charge of the Board's warehouse and voting machine maintenance program, Respondent continues to be responsible for signature of his son's Time Sheets, and there is no indication in the record of any action taken to formally separate Respondent from ultimate responsibility for his son's employment activities for the Board.

7. During the time period that is relevant to this complaint, the personnel rules of Prince George's County did not apply to prohibit employment in the particular jobs at issue of individuals who were related to employees in the agency, and in fact during this and earlier periods individuals related to various Board members and employees were employed by the Board in positions similar to those involving Respondent's family members. Testimony was that employment of such persons was relied upon to meet pressing needs at election times to recruit reliable and competent persons for low paying but essential jobs.

8. During the years 1988 through 1994 Respondent filed financial disclosure statements with the State Ethics Commission pursuant to the requirements of Subtitle 6 of the Ethics Law (formerly Title 4 of Article 40A). These statements, however, did not include disclosure of his spouse's or children's employment generally, or the employment relationships of his relatives with the Board as set forth above, even though the form and the instructions to it clearly indicate that disclosure is re-

quired of *any* employment of a spouse or dependent children. Subsequent amendments to these forms have been submitted and Respondent's financial disclosure status now is current and complete.

The Commission found that Antonetti, as a public official serving in an executive unit of Maryland State Government, must comply with "the requirements and limitations of the Ethics Law," Md. Ann.Code, State Gov't, § 15–101 et seq. (1984, 1995 Repl.Vol.)[6], and with the personnel provisions of Prince George's County, Md., Code §§ 16–117 through 16–120 (1995 ed.):

> "[w]e further conclude as a matter of law that Respondent's actions relating to the employment of his relatives as set forth in paragraphs 3 through 6 of the Findings of Fact constituted participation covered by § 15–501 of the Ethics Law .... each of the types of transactions involved a discrete decision, determination or finding, and Respondent's actions in each of these types of matters affected the final decisions as to the matters, involved his discretion and judgment, and in most situations was an essential action to reaching a particular result for the employee-relative (either establishing the employment relationship, reflecting a finding of eligibility, or processing a claim for payment). Moreover, these actions all related to determinations that would lead to compensation that would accrue directly to the economic benefit of his spouse or minor children. Under the circumstances, it is our conclusion as a matter of law that Respondent's actions constituted nonministerial participation in matters in which his relatives had an interest, as prohibited by § 15–501 of the Law."

The Commission determined that Antonetti did not violate the strictures of § 15–506 of the Public Ethics Law, Md.Code Ann., State Gov't (1984, 1995 Repl.Vol.), since it

> "define[s] a stricter standard for application, and that a violation should be found only where there is a clear show-

---

6. Formerly Md. Ann.Code art. 40A, § 1–101 et seq. (1957, 1990 Repl. Vol.)

ing of intentional and improper abuse of position. While we therefore believe that the circumstances here could suggest a violation of this section, given the agency's concerns and the long-standing practice [of other Board employees family members working for the Board], we decline to exercise our enforcement discretion to find [Antonetti] in violation of this section of the Law."

Additionally, the Commission found that Antonetti was required by § 15–607 of the Public Ethics Law to disclose the employment of his spouse and children on his annual financial disclosure statements and failed to properly do so for calendar years 1988 through 1994.[7]

Accordingly, on May 1, 1997, the Commission ordered that Antonetti stop employing his wife and children at the Prince George's County Board of Elections and terminate any further supervisory actions, including signing supplemental pay authorizations and time sheets[8] concerning any continued employ-

---

7. Section 15–607 states in relevant part as follows:
 (a) *In general.*—A statement that is required by § 15–601(a) of this subtitle shall contain schedules disclosing the information and interests specified in this section, if known, for the individual making the statement for the applicable period under this subtitle.
 \* \* \*
 (h) *Family members employed by State.*—The statement shall include a schedule listing the members of the immediate family of the individual who were employed by the State in any capacity at any time during the applicable period.
 (i) *Sources of earned income.*—The statement shall include a schedule listing the name and address of each:
 (1) place of salaried employment of the individual or a member of the individual's immediate family at any time during the applicable period; and
 (2) business entity of which the individual or a member of the individual's immediate family was a sole or partial owner, and from which the individual or family member received earned income, at any time during the applicable period.
 Md.Code Ann. State Gov't. § 15–607 (1984, 1995 Repl.Vol.). This section was formerly codified at Md. Ann.Code art. 40A, § 4–103 (1957, 1990 Repl.Vol.).

8. When the Commission rendered its decision, Robert, Jr. still held a position as a Voting Machine Technician II with the Board, and was

ment by his son, Robert, Jr., with the Board. The Commission recommended that either the Board or Prince George's County order that Antonetti endure "not less than 15 days of suspension without pay, and further, direct the staff of the Ethics Commission to take appropriate action pursuant to § 15–902 to petition the Circuit Court for imposition of a civil fine of $7,500." With regard to his improperly filed financial disclosure statements, Antonetti was ordered to pay a late filing fee of $1,000.00. The Commission also officially reprimanded Antonetti.

Antonetti filed an action for judicial review of the Commission's decision in the Circuit Court for Prince George's County pursuant to Maryland Rule 7–201. The Circuit Court for Prince George's County vacated the Commission's decision and remanded the case to the Commission solely for a redetermination as to an appropriate sanction for Antonetti's failure to file properly completed financial disclosure statements pursuant to Md.Code Ann., State Gov't. § 15–607. The Court found that although Antonetti had complied with the employment provisions of the Prince George's County Code,[9] he also had a duty to comply with the Public Ethics Law, covering the employment issues related to the facts of this case. Pursuant to its review of the record, however, the Circuit Court exonerated Antonetti in the following:

> the Commission, itself, has expressly acknowledged it was the Board of Elections, and not Antonetti, that made the final hiring and compensations decisions. The record is clear that not only was the Board of Elections well aware that the Petitioner's relatives were occasionally working for the Board, but that the Board approved of their hiring.

Thus, the Circuit Court found that Antonetti's participation with regard to the hiring and payment of his family members

---

permitted to continue in this capacity, so long as respondent had no supervisory role with regard to his employment.

9. Prince George's County Md., Code §§ 16–117 through 16–120 (1995 ed.).

fell within the exceptions set forth in § 15–501(b)(2) and 15–501(c).[10]

The Court also disagreed with the Commission's finding that Antonetti's execution of supplemental pay authorizations for his family members amounted to unlawful participation under § 15–501(a) of the Public Ethics Law. The Circuit Court reasoned that Antonetti's actions, which the Court characterized as "mechanical act[s] merely to insure payroll," were permissible under the statute because Antonetti was the only individual authorized by the Prince George's County Office of Finance to sign payroll authorizations. The Court concluded that "[t]he administrative record shows no indications of improper bias or influence" on the part of Antonetti. The Circuit Court ordered that the State Ethics Commission's Order of May 1, 1997, be vacated and remanded to the Commission for a proper determination of a sanction for Antonetti's failure to file properly completed financial disclo-

---

**10.** The exceptions for conflicts of interest with regard to participation in the employment matters of a public officials' family members as set forth in § 15–501 of the Public Ethics Law are as follows:

(b) *Exceptions.*—(1) The prohibitions of subsection (a) of this section do not apply if participation is allowed:

(i) as to officials and employees subject to the authority of the Ethics Commission, by regulation of the Ethics Commission;

(ii) by the opinion of an advisory body; or

(iii) by another provision of this subtitle.

(2) This section does not prohibit participation by an official or employee that is limited to the exercise of an administrative or ministerial duty that does not affect the disposition or decision with respect to the matter involved.

(c) *Participation notwithstanding conflict.*—An official or employee who otherwise would be disqualified from participation under subsection (a) of this section shall disclose the nature and circumstances of the conflict, and may participate or act, if:

(1) the disqualification would leave a body with less than a quorum capable of acting;

(2) the disqualified official or employee is required by law to act; or

(3) the disqualified official or employee is the only individual authorized to act.

Md.Code Ann., State Gov't. § 15–501 (1984, 1995 Repl.Vol.). These provisions were formerly codified at Md. Ann.Code art. 40A, § 3–101 (1957, 1990 Repl.Vol.).

sure statements covering the period from 1988 through 1994 pursuant to Md.Code Ann., State Gov't. § 15–607, a violation from which Antonetti had not appealed.

On March 19, 1999, the State Ethics Commission noted an appeal from the Memorandum and Order of Court of the Circuit Court of Prince George's County. In an unreported decision the Court of Special Appeals affirmed the Circuit Court decision, agreeing, in part, with the Circuit Court's reasoning, stating that "[s]ome, but not all, of Antonetti's actions that the Commission found violated the Ethics Laws come within the ambit of the exception set forth in section 15–501(c)(3)." The Court stated that,

> the trial judge was correct when he reversed the decision of the Commission to the extent that the Commission punished Antonetti for violating the Ethics Laws by signing his name to documents relating to employment of members of his immediate family. Thus, the Commission's order that Antonetti desist from performing any 'signature actions' relating to any continuing employment of Robert, Jr., with the Board must be reversed.

With regard to findings of fact, the Court of Special Appeals stated that,

> Antonetti was never the direct supervisor of his wife or any of his children. Furthermore, Antonetti did not have *de jure* authority to hire or fire any Board employees. Only the Board itself had such authority. In some instances, however, he did have *de facto* power to hire temporary employees.

Petitioner, the State Ethics Commission ("Commission"), filed a Petition for Writ of Certiorari to this Court on October 30, 2000, asking us to consider whether the Public Ethics Law prohibits a public official from recruiting, recommending, hiring, promoting, or placing under his supervision the members of his immediate family, where such actions result in a direct monetary benefit to his household as a result of their employment. We granted certiorari and now reverse the Court of Special Appeals and determine that Antonetti's conduct with

regard to the recruitment, hiring, promoting, and supervising of his family members as employees of the Board violates the conflicts of interest provisions set forth in Md.Code Ann., State Gov't. §§ 15–501(a) and 15–506.

## II. Standard of Review

The Maryland Administrative Procedures Act, Md.Code Ann., State Gov't. § 10–101 et seq. (1984, 1995 Repl.Vol.), sets forth the options of a circuit or appellate court reviewing the final decision or order of an administrative agency. Section 10–222(h) specifies that:

In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary and capricious.

Md.Code Ann., State Gov't § 10–222(h). Therefore, we must determine whether the Commission's decision was affected by an error of law in concluding that Antonetti violated the Public Ethics Law. *See Register of Wills for Baltimore County v. Arrowsmith*, 365 Md. 237, 249, 778 A.2d 364, 371 (2001).

In reviewing this matter, "we reevaluate the decision of the agency, not the decision of the lower court." *Gigeous v. Eastern Correctional Institution*, 363 Md. 481, 495–96, 769 A.2d 912, 921 (2001). Thus, our role is "limited to determining if there is substantial evidence in the record as a whole to

support the agency's findings and conclusions," and to ascertain whether the Commission's decision was based upon "an erroneous conclusion of law." *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994). In order to find that there was substantial evidence on the record to support the Commission's conclusions, we must determine that based on the record, a reasonable mind could have arrived at the same conclusions as the Commission. *See Alviani v. Dixon,* 365 Md. 95, 108, 775 A.2d 1234, 1241 (2001); *Anderson v. Department of Public Safety,* 330 Md. 187, 213, 623 A.2d 198, 210 (1993); *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978). This requires us to ask whether it could reasonably be said that the agency's conclusions may be based upon the facts set forth before the agency, without substituting our own judgment as to whether the agency's inferences were the best ones which could have been made based on the record. *See Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625–26, 547 A.2d 190, 195 (1988); *Mayor & Aldermen of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979); *Bulluck v. Pelham Wood Apartments,* 283 Md. at 513, 390 A.2d at 1124. In so doing, we are deferential towards the agency's findings of fact and the inferences drawn by the agency from those facts. *See State Administration Board of Election Laws v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819, 826 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989).

 Where the agency's findings of fact and inferences are supported by the evidence in the record, the reviewing court must defer to the agency. *See Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376, 380–81 (1999). Therefore, we "review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence." *CBS, Inc. v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990)(quoting *Ramsay,*

*Scarlett & Co. v. Comptroller,* 302 Md. 825, 834–35, 490 A.2d 1296, 1301 (1985))(internal quotations omitted).

■ With regard to the Commission's conclusions of law, Antonetti argues that reviewing courts may substitute their own judgment for that of the administrative agency. That is true, but it is also the case that reviewing courts should give some degree of deference to the legal conclusions of the administrative agency: "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Banks,* 354 Md. at 69, 729 A.2d at 381; *see Lussier v. Maryland Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996); *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989). Nevertheless, we owe no deference to agency conclusions based upon errors of law. *Belvoir Farms Homeowners Association, Inc. v. North,* 355 Md. 259, 267, 734 A.2d 227, 232 (1999); *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749, 753 (1998).

## III. Discussion

Petitioner argues that Antonetti's involvement in the employment of his family members with the Board exceeds any "administrative duty" as he played a direct and substantial role in obtaining their employment and in the management and supervision of his family members as employees of the board. Antonetti would have the employment of his offspring, even at the tender ages of nine and eleven years old, and his wife be seen as a conundrum of the election process, because he asserts that no one else was available to perform the jobs. The perceived lack of skilled or unskilled labor cannot overwhelm the inappropriateness of Antonetti's continuous decisions with respect to his relatives' employment.

■ Public confidence in the performance of government officials is of paramount importance. *See Carroll County Ethics Commission v. Lennon,* 119 Md.App. 49, 61, 703 A.2d 1338, 1344 (1998)(emphasizing that the need to investigate and

sanction alleged ethical violations is "perhaps even more acute ... at the local government level, where the government and its citizens have greater contact with one another").[11] Legislative recognition of this tenet is embodied in § 15–101 of the Public Ethics Law, which explains its purpose and policy, stating as follows:

> (a) *Legislative findings.*—(1) The General Assembly of Maryland, recognizing that our system of representative government is dependent upon the people maintaining the highest trust in their government officials and employees, finds and declares that the people have a right to be assured that the impartiality and independent judgment of those officials and employees will be maintained.
>
> (2) It is evident that this confidence and trust is eroded when the conduct of the State's business is subject to improper influence or even the appearance of improper influence.
>
> (b) *Policy.*—For the purpose of guarding against improper influence, the General Assembly enacts this Maryland Public Ethics Law to require certain government officials and employees to disclose their financial affairs and to set minimum ethical standards for the conduct of State and local business.
>
> (c) *Liberal construction of title.*—The General Assembly intends that this title, except its provisions for criminal sanctions, be liberally construed to accomplish this purpose.

Md.Code Ann., State Gov't. § 15–101 (1984, 1995 Repl.Vol.).[12]

The prohibition of public officials' involvement in the employment of their relatives is embodied in the proscriptions of § 15–501 of the Public Ethics Law:

> (a) *In general.*—Except as otherwise provided in subsection (c) of this section, an official or employee may not participate in a matter if:

---

**11.** The Prince George's County Board of Election Supervisors is a State agency, rather than a local government entity.

**12.** Formerly at Code, Art. 40A § 1–102 (1957, 1990 Repl.Vol.).

(1) the official or employee or a qualifying relative of the official or employee has an interest in the matter and the official or employee knows of the interest;

\* \* \*

(b) *Exceptions.*—(1) The prohibitions of subsection (a) of this section do not apply if participation is allowed:

(i) as to officials and employees subject to the authority of the Ethics Commission, by regulation of the Ethics Commission;

(ii) by the opinion of an advisory body; or

(iii) by another provision of this subtitle.

(2) This section does not prohibit participation by an official or employee that is limited to the exercise of an administrative or ministerial duty that does not affect the disposition or decision with respect to the matter involved.

(c) *Participation notwithstanding conflict.*—An official or employee who otherwise would be disqualified from participation under subsection (a) of this section shall disclose the nature and circumstances of the conflict, and may participate or act, if:

(1) the disqualification would leave a body with less than a quorum capable of acting;

(2) the disqualified official or employee is required by law to act; or

(3) the disqualified official or employee is the only individual authorized to act.

Md.Code Ann., State Gov't. § 15–501.[13] For purposes of this statute, a "qualifying relative" is defined as "a spouse, parent,

---

**13.** This provision was formerly codified at Code, Art. 40A § 3–101 (1957, 1990 Repl.Vol.), which stated in relevant part as follows:

"(a) Except as permitted by regulation of the Commission as to officials and employees subject to its authority, the opinion of an advisory body, or other provisions of this title, an official or employee may not participate in any matter, except in the exercise of an administrative or ministerial duty which does not affect the disposition or decision with respect to that matter, if, to his knowledge, he,

child, brother, or sister," while an "employee" is anyone who is employed by an executive unit, the Legislative Branch, or the Judicial Branch of Maryland State Government, excluding those individuals who may be otherwise classified as public or State officials. §§ 15–102(g) and (ff). The statute defines an "interest" as:

(1) "Interest" means a legal or equitable economic interest that is owned or held wholly or partly, jointly or severally, or directly or indirectly, whether or not the economic interest is subject to an encumbrance or condition.

(2) "Interest" does not include:

(i) an interest held in the capacity of agent, custodian, fiduciary, personal representative, or trustee, unless the holder has an equitable interest in the subject matter;

(ii) an interest in a time or demand deposit in a financial institution;

(iii) an interest in an insurance policy, endowment policy, or annuity contract by which an insurer promises to pay a fixed amount of money in a lump sum or periodically for life or a specified period; or

(iv) a common trust fund or a trust that forms part of a pension or a profit-sharing plan that:

1. has more than 25 participants; and

2. is determined by the Internal Revenue Service to be a qualified trust under § 401 or § 501 of the Internal Revenue Code.

Md.Code Ann., State Gov't § 15–102(t).[14]

The Public Ethics Law also prohibits State employees, such as Antonetti, from "intentionally us[ing] the prestige of office or public position for that public official's or employee's private gain or that of another." § 15–506. We have often stated that the basic premise of statutory interpretation is to

his spouse, parent, minor child, brother, or sister has an interest therein . . ."

14. Derived without substantive change from former Md. Ann.Code art. 40A, § 1–201(o)(1957, 1990 Repl.Vol.).

"ascertain and effectuate the intention of the legislature." *Tipton v. Partner's Management Co.,* 364 Md. 419, 434, 773 A.2d 488, 497 (2001); *Total Audio–Visual Systems, Inc. v. Department of Labor, Licensing & Regulation,* 360 Md. 387, 411–12, 758 A.2d 124, 137 (2000); *Langston v. Riffe,* 359 Md. 396, 410, 754 A.2d 389, 396 (2000)(internal citations omitted). To ascertain the legislative intent and the scope and applicability of the Public Ethics Law to the case *sub judice,* we must look first at the plain meaning of the words of the statute. *See Marriott Employees Federal Credit Union v. Motor Vehicle Administration,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997). Where the statute does not contain obscure or ambiguous language, "and expresses a definite and simple meaning," we need not look beyond the plain language of the statute in order to understand the legislative intent. *Board of License Commissioners for Charles County, Maryland v. Toye,* 354 Md. 116, 122, 729 A.2d 407, 410 (1999); *see Chesapeake & Potomac Telephone Co. of Maryland v. Director of Finance for Mayor and City Council of Baltimore,* 343 Md. 567, 578–79, 683 A.2d 512, 517 (1996). Ultimately, we must construe the words of the statute such that we avoid a result which is absurd, illogical, unreasonable, or inconsistent with common sense. *See Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 811, 709 A.2d 1301, 1304 (1998); *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994), *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992).

■ In determining whether the Commission's decision to sanction Antonetti for violating the Public Ethics Law was supported by substantial evidence, we must consider the factual basis for each of Antonetti's alleged violations of the statute and the application of the statutory language to these instances of misconduct. Antonetti asserts that he did not violate the Public Ethics Law through his involvement in the recruiting, hiring, supervising, and promoting of his spouse and children.

■ The Public Ethics Law prohibits public officials from participating in matters where either the public official or the public official's qualifying relatives have an interest in the

matter. Md.Code Ann., State Gov't. § 15–501. The statute also precludes public officials from using their positions to benefit their own "private gain, or that of another." Md.Code Ann., State Gov't. § 15–506. Here, we are confronted with a situation where Antonetti and his wife and minor children, who are all "qualifying relatives" as defined by § 15–102(f), had a direct interest in the income generated by their employment with the Board. Although the Public Ethics Law does not define what constitutes "participation" in a matter for purposes of the conflicts of interest section, Webster's New World College Dictionary at 1050 (4th ed.1999) defines the verb "participate" as "to have or take a part or share with others (in some activity, enterprise, etc.)." We have stated that "the analysis of the statute's language must be undertaken from a commonsensical rather than a technical, perspective, always seeking to avoid giving the statute a strained interpretation . . ." *Langston v. Riffe*, 359 Md. 396, 445–46, 754 A.2d 389, 416 (2000)(quoting *Bane v. State*, 327 Md. 305, 309, 609 A.2d 313, 314–15 (1992)). In the absence of any additional statutory language or legislative history indicating a contrary intent, we ascribe to the phrase "participate in" as used in § 15–501(a) its ordinary and commonly understood meaning. *See Metheny v. State*, 359 Md. 576, 618, 755 A.2d 1088, 1111 (2000)(using dictionary to define the conjunction "while" in interpreting Md.Code Ann. art. 27A, § 413(d)(10)); *Riemer v. Columbia Medical Plan, Inc.*, 358 Md. 222, 237, 747 A.2d 677, 685 (2000)(using dictionaries to define the terms copayment and deductible in interpreting Md.Code Ann., Health–Gen. §§ 19–701(f), 19–710(b) and (o)).

The record shows that, although the Board needed to fill temporary work positions during every election, neither the Board nor Antonetti in his capacity as Elections Administrator actively advertised for these positions. The only positions for which the Board advertised were for election judges. It is clear from the record, however, that in establishing the original employment relationship with the Board, Antonetti asked his family members to fill the vacant positions.

The record also discloses that Antonetti signed at least eleven supplemental pay authorization forms, four employment eligibility verification forms, and thirty-six time sheets on behalf of his family members while acting in his capacity as Administrator. The act of signing a supplemental pay authorization form allows agencies to hire people directly and bypass the Office of Personnel of Prince George's County. The record indicates that the Board only voted by motion on one occasion to hire one of Antonetti's relatives, Theresa, once she had attained the age of majority, as a pre-election clerk. On all other occasions, the testimony of the members of the Antonetti family and the Board members at the hearing before the Commission showed that Antonetti either recruited his family members to work for the Board, or they asked him for positions directly. For example, Robert, Jr. testified as follows:

Commission: One final question. How did you decide to become a voting technician, how did that come about?

Robert, Jr.: Well, I was looking for a summer job at the time. I wanted to do something that—I didn't want to flip burgers like all my friends were doing, and I had been up to the warehouse before prior and I always been interested in what the guys were doing with the machines and I asked my father if I could somehow get a job or be considered for a job, and there was an opening and I applied and I was accepted and the rest is history.

Robert, Jr. never had a formal interview for this position.

Antonetti was not legally obligated to hire his family members as employees of the Board, and therefore, he improperly used his position with the Board to exercise his discretion to do so in violation of §§ 15–501 and 15–506. Antonetti argues that other personnel of the Board office also had their relatives employed in temporary positions with the Board during the time period in question. Although the record disclosed that other personnel of the Prince George's County Board of Elections may have had family members employed with the Board as temporary part-time employees, the full-time personnel of the Board were not in employment positions where they

had the authority to hire people, let alone to procure employment for their own relatives. In any event, that would not excuse violations by Antonetti. In contrast, Antonetti, as an agency head who had been vested with hiring authority to use supplemental pay authorization forms to sanction the employment of temporary employees with the Board and so abused his position by hiring his spouse and children.

Although he attempts to do so, Antonetti cannot successfully claim that he was uninvolved in the final phase of hiring his spouse and children for the temporary employment. Antonetti argues that hiring members of his immediate family was conducted by the Board of Elections in conjunction with the Office of Personnel of Prince George's County. As such, Antonetti would have this Court believe that he disclosed the employment of his family members to the Board in keeping with the exception set forth in § 15–501(c) which allows a public official to participate where there would otherwise be a conflict of interest so long as "the nature and circumstances of the conflict" are disclosed and the public official must participate as required by law, by virtue of the fact that they are the only individuals authorized to act in the circumstance, or in order to prevent a loss of quorum where needed. There is no evidence on the record to suggest that the Office of Personnel of Prince George's County had any knowledge that Antonetti's family members were on the county payroll until February 8, 1995, when the Prince George's County Government Office of Audits and Investigations reviewed the employment practices of the Board.[15] Antonetti's system of using supplemental pay authorization forms allowed him to hire employees without any review by the Office of Personnel. Thus, Antonetti used the authority granted to him by virtue of his position as Elections Administrator to circumvent the Office of Personnel through

---

15. As a result of this audit, the Prince George's County Government Office of Audits and Investigations issued a memorandum to Antonetti informing him that the provisions of the Prince George's County Code addressing the hiring of family members did not apply in this situation because "none of the positions that were filled are in the County's classified service." See Prince George's County Code, Subtitle 16.

his extensive use of supplemental pay authorization forms to procure employment on behalf of his family.

The record discloses a similar lack of knowledge by the Board of the employment status of Antonetti's spouse and children. At the hearing before the Commission Jacqueline C. White, who served as President of the Board during the relevant period of inquiry and had previously served as secretary to the Board, testified that after reviewing the minutes of the Board as far back as 1979 she could not find any indication of where the Board had approved the hiring of Antonetti's wife or children. While other members of the Board testified that they saw Antonetti's wife and children in and around the office and at the storage warehouse with their father, knowledge of their mere presence and knowledge that these people, including children as young as nine years old, were on the county payroll are two vastly different matters. In addition to Antonetti's failure to satisfy the disclosure requirement of § 15–501(c), the record contains no evidence which could support the argument that Antonetti engaged in this self-serving conduct based on a requirement of the law, because he sought to preserve a quorum on the Board, or because he was the only individual authorized to act.

In an attempt to place himself within the scope of the exceptions set forth in § 15–501(b)(2), concerning the non-applicability of the conflicts of interest provisions to the performance of duties which are purely "administrative or ministerial," Antonetti argues that he acted in a purely ministerial capacity because he was the only person authorized to sign the supplemental pay authorization forms. At the hearing before the Commission on January 21, 1997, the following dialogue took place during Antonetti's cross-examination:

Q: It's true, based on testimony we heard today, it's your practice to sign all the time sheets, it's your practice to sign all the supplemental payroll?

A: Ministerial responsibility, yes.

Q: I asked—let me ask if you sign all of them?

A: Yes.

Q: You believe that to be a ministerial duty?

A: Correct.

Q: If you refused to sign them, what would happen?

A: Nobody would be paid.

Q: It seems to me that's a major impact.

A: As far as I understand, it is ministerial while I'm there. I'm the only authorized signature by Payroll.

Antonetti's broad declaration of his opinion that he acted in a ministerial capacity with regard to his signatory actions, however, fails to demonstrate that his conduct falls within the exception to the participation in the employment of family members as set forth in § 15–501(c) of the Public Ethics Law.

 In explaining the distinctions between exercising discretion and performing purely ministerial functions, this Court has stated that:

> The term "discretion" denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, "discretion" is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience, and uncontrolled by the judgment or conscience of others.

*Ashburn v. Anne Arundel County*, 306 Md. 617, 623, 510 A.2d 1078, 1081 (1986)(quoting *Schneider v. Hawkins*, 179 Md. 21, 25, 16 A.2d 861, 864 (1940)). Thus, a person engages in non-ministerial or discretionary functions when he or she exercises judgment in the process of establishing and maintaining employment relationships for their family members with the Board. *See Bovey v. Executive Director, Health Claims Arbitration Office*, 292 Md. 640, 649, 441 A.2d 333, 338 (1982)(holding that where the director needed to exercise "his sound judgment and discretion" the director's actions were not ministerial and thus a writ of mandamus could not be executed "to compel him to follow any stated procedure").[16]

---

16. The State Ethics Commission issues published advisory opinions concerning the application of the Public Ethics Law, which may be

If someone else had been authorized to sign these forms following approval of employment by the Board, then it could be said that Antonetti's signatory action may have been merely ministerial. *See Freeman v. Local 1802, American Federation of State, County and Municipal Employees Council 67, AFL–CIO,* 318 Md. 684, 696, 569 A.2d 1244, 1250 (1990). Antonetti was not merely rubber-stamping these forms at the behest of another party. He used the authority granted to him by virtue of his position as Board Administrator to authorize the employment and payment of his relatives with the Board. Thus, the facts and inferences to be drawn from the record support the Commission's conclusion that Antonetti violated the tenets of Md.Code Ann., State Gov't, §§ 15–501 and 15–506.

■ With regard to Antonetti's transgression in failing to disclose that members of his immediate family were employed by the Board on his annual financial disclosure forms, we conclude that the record supports the Commission's findings of fact and conclusion of law that Antonetti violated the clear mandate of disclosure set forth in Md.Code Ann., State Gov't, § 15–607. In his position as the Administrator for the Board, Antonetti was required by law to file under oath annual financial disclosure statements with the Commission. Md.

---

relied upon by those subject to the provisions of the statute. *See* Md.Code Ann., State Gov't. § 15–301. The Commission has long held that § 15–502 and § 15–506 and their predecessors, Md. Ann.Code, art. 40A §§ 3–101 and 3–104 (1957, 1990 Repl.Vol.), "would be violated if employees or officials took action to urge the hiring of relatives or if they used their position to advance the employment positions or benefits of relatives" and would restrict participation by State employees in the "hiring, firing, evaluation, or other personnel-related matters that involve the listed relatives." Opinion No. 92–5, State Ethics Commission, C.O.M.A.R. 19A.01.02; *see* Opinion Nos. 85–8, 84–8, 81–37, and 81–2.

In Advisory Opinion No. 81–37, the Commission explained that an individual engages in non-ministerial actions when he uses "his judgment, professional expertise and discretion." Similarly, the Commission includes "acting through approval, decision, recommendation, or rendering of advice" as participation in the employment of a relative which would be prohibited under § 15–501 (formerly § 3–101). Opinion No. 81–37.

Code Ann., State Gov't. §§ 15–601, 15–602. The statements were to include Antonetti's interests in real property, in corporations and partnerships, interests in business entities conducting business with the State, gifts, employment by or interest in business entities doing business with the State, indebtedness to entities doing business in the State, family members employed by the State, and sources of earned income. Md.Code Ann., State Gov't. § 15–607. The relevant subsection of the statute states that:

> The statement shall include a schedule listing the name and address of each:
>
> (1) place of salaried employment of the individual or a member of the individual's immediate family at any time during the applicable period; and
>
> (2) business entity of which the individual or a member of the individual's immediate family was a sole or partial owner, and from which the individual or family member received earned income, at any time during the applicable period.

Md.Code Ann., State Gov't. § 15–607(i).

Antonetti conceded his error in completing the financial disclosure forms in his testimony before the Commission. Although he filed additional forms in 1995 to correct his earlier omissions, he nevertheless violated the clear language of Md.Code Ann., State Gov't. § 15–607 which requires disclosure of all employment for his immediate family members. As a public official, entrusted with upholding high standards of moral and ethical conduct in engendering the support and trust of the community which he served, Antonetti transcended mere offensiveness by omitting in financial disclosure statements filed under oath, to disclose the very employment he procured for his family.

We hold that Antonetti violated §§ 15–501, 15–506 and 15–607 of the Public Ethics Law through his participation in recruiting, hiring, promoting and supervising his family members as employees of the Board, and by failing to file properly

completed financial disclosure statements, as required by law, from 1988 through 1994.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE ORDER OF THE STATE ETHICS COMMISSION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

HARRELL, Judge, dissenting.

I dissent. The Court of Special Appeals, for the reasons stated in its unreported opinion, was correct in affirming the judgment of the Circuit Court. Because that opinion was unreported, I re-publish here the relevant portions of its reasoning. I shall add an embellishment or two of my own later in this dissent.

The Court of Special Appeals reasoned as follows:

"Some, but not all, of Antonetti's actions that the Commission found violated the Ethics Laws come within the ambit of the exception set forth in section 15–501(c)(3).[1]

"The Commission found that Antonetti violated the Ethics Laws in two distinct ways, *viz:* (1) by signing numerous documents relating to the hiring or payment of his relatives and (2) by hiring, or being indirectly responsible for hiring, of his relatives.

---

1. That exception provides:

(c) Participation notwithstanding conflict.—An official or employee who otherwise would be disqualified from participation under subsection (a) of this section shall disclose the nature and circumstances of the conflict, and may participate or act, if:

\* \* \*

(3) the disqualified official or employee is the only individual authorized to act.

## "A. *Signature on Documents*

"In its findings of fact, the Commission found:

"3. During the period of time relevant to this complaint (1988 to 1994), [Antonetti] in his official capacity as Elections Administrator took many actions involving his spouse Mary Antonetti and his four children (Robert, Jr., Theresa, Edward, and John), all of whom were, at most times involved in this matter, minor children. These actions involved signatures on no fewer than 11 Supplemental Pay Authorizations, 4 Employment Eligibility Verifications, and 36 Time Sheets. The Supplemental Pay Authorizations were the key hiring documents, attesting to the employment of individuals with the Board and authorizing the agency to compensate them for services. The Eligibility Verifications were essential legal documents reflecting a finding by the Respondent on behalf of the agency that individuals met Federal citizenship requirements and were eligible to be employed by the Board. The Time Sheets were the key fiscal documents allowing the County payroll authorities to issue checks compensating individuals for work performed as set forth in the document. The testimony in this matter was that these documents were essential for payment to be made and that they could be signed only by [Antonetti]. It was stated that without [Antonetti's] signature, an individual would not be paid.

\* \* \*

"6. According to Time Sheet documents and testimony in the record, [Antonetti's] now-adult son Robert, Jr. continued as recently as Summer 1996 to be employed by the Board as a voting machine technician. Though the record reflects his direct supervision primarily by Sam McAfee, another senior employee in charge of the Board's warehouse and voting machine maintenance program, [Antonetti] continues to be responsible for signature of his son's Time Sheets, and there is no indication in the record of any action taken to formally separate [Antonet-

ti] from ultimate responsibility for his son's employment activities for the Board.

"The Board's conclusions of law included a finding that the signing of the various employment documents constituted a violation of section 15–501 of the Ethics Laws. In reaching that conclusion, the Commission did not discuss whether the provisions set forth in section 15–501(c)(3) shielded Antonetti's actions. It is clear to us that, insofar as the Commission found that Antonetti violated the Ethics Laws by signing various time sheets and other employment documents, the Commission's decision must be reversed.

"In the hearing before the Board, it was uncontroverted that Antonetti was the only employee authorized to sign employment documents. And the Commission's own findings demonstrated this when they found that "these documents (supplemental pay authorizations, employment verifications, and time sheets) were essential for payment to be made and ... they could be signed only by [Antonetti]." Moreover, the evidence before the Board was clear that the Board knew that Antonetti's family members were working for the Board, that his family members were being paid, and that, as the Supervisor for the Board, he signed the time sheets and other documents necessary for them to be hired and for their salaries to be paid. Thus, the "nature and circumstances" of the conflict was disclosed.

"The trial judge was correct when he reversed the decision of the Commission to the extent that the Commission punished Antonetti for violating the Ethics Laws by signing his name to documents relating to employment of members of his immediate family. Thus, the Commission's order that Antonetti desist from performing any "signature actions" relating to any continuing employment of Robert, Jr., with the Board must be reversed.

### "B. Recommendation to the Board that Family Members Be Hired

"In its findings of fact, the Commission found:

"5. The record also indicates that [Antonetti] on more than one occasion, in his official capacity[,] recruited individuals who were his relatives or took actions designed to result in an employment relationship between them and the agency, which was intended to benefit them economically. Testimony by [Antonetti's] spouse and at least one of his sons was that "my husband" or "my father" suggested their employment with the Board. Lists were generated and included in the record that include [Antonetti's] relatives' names as recommended by him for employment, and on one occasion minutes of the Board meeting reflect a recommendation by [Antonetti] for the employment by the Board of his daughter Teresa (then an adult).

"In its conclusions of law the Commission found, *inter alia*, that Antonetti's actions relating to the employment of family members as set forth in Paragraph 5, violated the Ethics Laws. On its face, that conclusion of law is wrong insofar as it found that "on one occasion minutes of the Board meeting reflect a recommendation by [Antonetti] for the employment by the Board of his daughter [Teresa] (then an adult)." It was not a violation of the Ethics Laws in May of 1994 for Antonetti to recommend the employment by the Board of his adult daughter. *See* Md. Ann.Code, art. 407, § 3–101 (1993 Repl.Vol.). Effective October 1, 1994, however, the law was changed to prohibit participation by officials in matters related to adult children. *See* 2 Laws of Maryland 1994, ch. 19.

"Aside from the conclusion as to Teresa, the Commission also found that it was a violation of the Ethics Laws to recommend to the Board that his family members be employed. That conduct is clearly not protected by the exception set forth in section 15–501(c)(3). Insofar as employment recommendations are concerned, Antonetti obviously was not "the only individual authorized to act."

* * * * * *

"Antonetti contends, in the alternative, that his recommendation(s) to the Board that his family members be hired

by the Board was not a violation of the Ethics Laws due to the exception set forth in section 15–501(b)(2) ("This section does not prohibit participation by an official or employee that is limited to the exercise of administrative or ministerial duty that does not affect the disposition or decision with respect to the matter involved.") is applicable.

"We agree with Antonetti. When he made recommendations to fill temporary clerical jobs and/or positions as book loaders,[7] Antonetti was

" [7] There was no evidence that Antonetti recommended to the Board or to anyone else that his son, Robert, Jr., be hired as a voting machine technician.

fulfilling an administrative duty. The question then becomes: Did Antonetti's recommendations affect the decision to hire members of his family? In this regard, the record was clear and unambiguous that it did not. To explain why this is so, an example is useful.

"If, in 1969, at the height of the Vietnam War, a four-star marine general recommended his son for a job as a social aide at the White House, and if, after that recommendation was received, the general's son was selected for that coveted position, it can be inferred, legitimately, that the general's recommendations affected the hiring decision because there obviously would be a host of eager and qualified applicants. But if the same marine general recommended his son to serve as a foot soldier in an infantry platoon in Vietnam and if the general's son was selected for that position, the general's recommendation, in all likelihood, would not have affected the decision because of the scarcity of applicants— eager or otherwise. Likewise, in the case *sub judice,* the record is clear that there was a scarcity of applicants for the jobs at issue. According to the uncontradicted testimony presented to the Commission, it was extremely difficult to get people to take part-time jobs for which Antonetti made recommendations. Due to that fact, many Board members, together with employees of the Board, recruited their own family members to fill the positions during the hectic period immediately preceding the primary and general elections.

There was no evidence presented to the Commission, nor any fact from which an inference could legitimately be drawn, that Antonetti family members would not have been hired if they had applied for a job with the Board and Antonetti had refused to make a recommendation. Thus, the Commission was clearly erroneous when it found that Antonetti's actions affected the Board's hiring decisions.[8]

[8] The relevant statement by the [Commission] regarding hiring recommendations was set forth in Paragraph 4 of its "Final Report and Order" as follows:

In our view, that the Board may have had final authority for the budget and for hiring and compensation decisions, does not alter the fact that Respondent is the senior professional employee for a citizen board that relies substantially on his professional expertise and experience. *Moreover, each of the types of transactions involved a discrete decision, determination or finding, and Respondent's actions in each of these types of matters, involved his discretion and judgment, and in most situations was an essential action to reaching a particular result for the employee-relative* (either establishing the employment relationship, reflecting a finding of eligibility, or processing a claim for payment). Moreover, these actions all related to determinations that would lead to compensation that would accrue directly to the economic benefit of his spouse or minor children. Under the circumstances, it is our conclusion as a matter of law that Respondent's actions constituted nonministerial participation in matters in which his relatives had an interest, as prohibited by § 15–501 of the Law."

(Some internal footnotes omitted; emphasis in original).

By way of embellishment, I note that in Finding of Fact # 2 in its Final Report and Order of 1 May 1997, the State Ethics Commission (Commission) stated ultimately that "[i]t is clear to us from the record that wherever the technical legal hiring authority lay, this [ (the Board of Supervisors of Elections for Prince George's County) ] is a citizen board that relies substantially on the efforts and recommendations of its full-time professional staff administrator to make hiring decisions, and that he in fact functions in this capacity." Based on my review of the record extract submitted to this Court, I conclude that such a finding, placed in its relevant context, is unsupported by competent, material, and substantial evidence and, therefore, is arbitrary and capricious. Rather, the record extract reveals a Board that, over the relevant period 1988–94, knowingly participated on at least equal terms with Respondent in pursuing an institutional policy of identifying and

retaining reliable seasonal/temporary election workers, including from within their own families. In this regard, the Board was no captive of, or slave to, its Administrator, Antonetti.

Jacqueline C. White, appointed as a Democratic member of the Board in 1993 and chosen its President in 1995,[2] described the various approaches employed by the Board to find and hire seasonal, temporary election help:

Usually at that time [just prior to an election] we're so busy that we're really not having a formal meeting, but Mr. Antonetti always lets us know who the people are, gets an approval, mostly by phone. Sometimes in meeting he will submit us a list, say this is the people I can get, and they look at it, say it's okay with them. They don't make a formal motion on most of them.

Leading up to the 1994 election, as one example, Antonetti supplied the Board with lists of the seasonal workers proposed to be hired, organized by job and indicating who had recommended each person for a non-partisan position. The lists for the clerical and book loaders positions indicated after each prospective employee's name a symbol that equated with that person having been recommended by either a Democratic Board member, Antonetti, or the sole Republican Board member, Mr. Deegan. Antonetti's family members were on the list under the positions for which they were to be hired, clearly identified as recommended by Antonetti.

As Ms. White explained, however, not all proposed seasonal hires in each election year were memorialized in writing in advance: "if there wasn't a meeting scheduled, we would usually do it by phone." [3] The Board's normal, twice-monthly meeting schedule was abandoned "around election time," due

---

**2.** Ms. White previously was employed as a secretary at the Board from 1979 until her appointment as a member.

**3.** As the Majority notes accurately, during the period between 1988 and 1994, the Board appears from this record to have memorialized the hiring of part-time personnel in the written minutes of its meetings only once, on 23 May 1994 for Theresa Antonetti, Monica Elliott, William Bohlayer, and Sean Hensley.

to the pressing tasks needing to be accomplished for the imminent election. Frequent telephone calls and weekly written reports became the modalities of Board communication and action.

The seasonal election hiring process, Ms. White testified, was triggered usually by Antonetti advising Board members of the need to fill certain positions. The Board members frequently would propose hiring a family member, friend, or acquaintance. This process achieved goals thought to be good by the Board as a whole, i.e., the obtention of reliable, and the retention of previously experienced, staff, thus saving the Board time and resources in training and recruitment for positions that, while important to the electoral process, were of short duration and relatively low paying. Even within that process, however, Ms. White recalled that "[t]here ha[d] been a couple [of times] in the past" when the Board rejected persons for employment recommended by Antonetti because "someone [on the Board] knew the person[s] and knew they weren't very reliable."

Ms. White recommended her adult son be hired temporarily to work at the Board's warehouse, and he was. She elaborated from personal knowledge a number of other examples of Board members, stretching back as far as 1979 and running through the Board's 1995 policy change,[4] who had recommended family members successfully for seasonal and other Board employment. In no case, however, save that mentioned in n. 3, *supra*, was the approval of any seasonal employee referenced in the Board's minutes.

Ms. Shirley E. Reio, the Board's supervising Republican Registrar,[5] corroborated Ms. White's testimony. Moreover,

---

4. The change, prohibiting the relatives of Board members or employees from Board employment (other than in the warehouse), was proposed by Antonetti and adopted by the Board, primarily in response to critical articles in local newspapers occasioned by complaints from "disgruntled" former Board members following the closely-contested 1994 statewide election.

5. Ms. Reio was employed at the Board from 1964 to 1994.

she acknowledged a practice, approved by the County's Payroll Division of its Office of Finance, whereby she prepared and signed, on the seasonal employee's behalf, the employee's time sheets. She did this as a convenience and for the sake of efficiency because the seasonal staff "had no reason to come into the office, and we could not run around the County obtaining these signatures...." She had recommended her grandchildren and daughter for Board employment, through Antonetti and the Republican Board member, Mr. Deegan.

Respondent testified that "all of the people [were] hired ... either through Board motion or through Board consent of some kind, approved to work in the Board...." Respondent testified that he did not "act independently of the Board." Regarding the process he and the Board employed for last minute hiring of seasonal, temporary election staff, particularly clerical and warehouse labor, Antonetti described it as follows:

Q. So you didn't make any advertisements in the newspapers, any ads?

A. It was through recommendations of board members, elected officials, family of people who were employed, or election judges would ask if they had some positions available.

Q. As the administrator you would have solicited the recommendations?

A. I don't solicit recommendations. I let the board know that we had these positions available and then if there were some names and so forth, I would tell the board here's some people that are looking for the position, would you want to hire them, and they would confirm it.

The closest to a contradiction of the hiring process described in the above evidence before the Commission was the stipulated "testimony" of Ms. Judith A. Wheatley, a former President and Democratic Board member between 1987–95, who would have testified, *inter alia,* that she was unaware Antonetti's children had been hired for the 1994 election until the County's personnel audit was made and that the Board

had not approved their hiring. Also, according to the stipulation, she would have acknowledged that her son and daughter had been Board employees during the same time, as a voting machine technician and a recruiter for Democratic election judges, respectively, but that no Board minutes reflected the Board's approval of their hiring. It was stipulated also that her daughter had been fired as a Board employee at some point during Ms. Wheatley's tenure as President. The stipulation, however, failed to specify who exactly fired Ms. Wheatley's daughter and under what circumstances and when.

Because Ms. Wheatley's testimony was received as a stipulation of counsel, there was no opportunity for the Commission to draw testimonial inferences based on a demeanor-based credibility assessment of Wheatley; thus, at most, only derivative inferences were available to be drawn from such parts of the stipulation as were not otherwise perceived to be discredited. *See Anderson v. Dep't of Public Safety,* 330 Md. 187, 210–218, 623 A.2d 198, 209–213 (1993) and *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 297–304, 641 A.2d 899, 906–909 (1994), and authorities discussed therein. Because the portions of the stipulation regarding the asserted lack of Board approval of hiring the Antonetti children for the 1994 election appear plainly contrary to most of the live testimonial and documentary evidence received by the Commission, a demeanor-based credibility assessment would be the only means by which an administrative fact-finder rationally could choose to believe Wheatley's stipulated statement over the evidence to the contrary. Given the straightforward and sweeping nature of the stipulated statements, no reasonable or supplemental derivative inferences are available. As a demeanor-based credibility assessment was not possible, it strikes me as untenable to accept that the stipulation as to Wheatley's relevant testimony could satisfy the substantial evidence prerequisite for any of the Board's fact-finding or conclusions. Accordingly, Wheatley's stipulation does not engage, in my view, the deferential standard of review ordinarily accorded by a reviewing court to an administrative agency's fact-finding.

Even if Wheatley's stipulated testimony could figure in the substantial evidence analysis of the Commission's fact-finding and conclusions, her statements pertained solely to the hiring of Antonetti's family members for the 1994 election. Her statements, if credited, fall far short of establishing a fairly debatable basis for the Commission's findings or conclusions relative to the 1988, 1990 or 1992 election hirings. To that extent, at a minimum, the Commission's decision was error.

The only other evidence that arguably could be construed to support the Commission's finding that, in effect, Antonetti led the Board around by its metaphysical nose regarding seasonal hiring decisions was the patently vague and inherently conflicted testimony of the lone Republican Board member, Mr. Charles C. Deegan. Mr. Deegan served on the Board during the 1988–94 period with which the Commission's charges were concerned. Although acknowledging broadly that seasonal, temporary election workers were hired "usually" after Board members were solicited and approved of the hirings, he professed to be "unaware" or did not "recall" that Antonetti's wife and two of his sons, John Paul and Edward, were employed by the Board for the 1994 election. His awareness of Mrs. Antonetti's employment arose when he saw her at the Board's offices on election day in 1994.[6] He stated he became aware of John Paul's and Edward's employment at the Board warehouse when he read a newspaper article about the Antonetti family working for the Board. Yet, he admitted he was aware of the employment of Antonetti's son, Robert, Jr., at the warehouse and Antonetti's daughter, Theresa, as a pre-election clerk, the latter because he recalled making the motion to hire her as reflected in the Board's 23 May 1994 meeting. *See* n. 3, *supra.* Mr. Deegan also responded negatively to the Commission's counsel's questions as to his awareness of the hiring of Edward for the 1992 election or John Paul for the 1990 or 1992 elections. He did not state, however, that the Board had not approved their hiring.

---

6. Presumably he was referring to the General Election of 1994.

Regarding the process of hiring seasonal, part-time staff, Deegan responded that the "practice of putting the names of [such hires] in the [Board's] minutes is of recent vintage" and was "[s]ometimes" followed and "other times it wasn't." Mr. Deegan acknowledged that he had recommended his niece for employment as a pre-election clerk, specifically discussing it with Antonetti. She was hired. As to his niece's hiring, Deegan could find no record of approval of that action in the Board's minutes, though he "thought" there had been such a record.

The equivocal nature and highly idiosyncratic quality of Mr. Deegan's unawareness or lack of recall as to the employment of Mrs. Antonetti in 1994, Edward in 1992 and 1994, and John Paul in 1990, 1992, and 1994, does not support the Commission's sweeping finding that the *Board,* as a unit, "relies substantially on ... its ... administrator to make hiring decisions, and that he in fact functions in this capacity." The Commission's presumed expertise in interpreting the State Ethics Law does not empower it to translate the slender reed of this testimony into the finding it made. The sum of Mr. Deegan's testimony that may, at first blush, seem contradictory to that of Ms. White, Ms. Reio, and Respondent's, does not rise above a scintilla of evidence in my analysis of whether the Commission's findings are supported on this record.

It fairly may be said that the Board's hiring practices for seasonal, part-time election personnel between 1988 and 1994 fell far short of best management practices. That now largely abandoned process also may fairly be criticized as overly informal and fraught with nepotism; however, Antonetti's role in the perpetuation of these internally well-understood processes and policies cannot be construed reasonably to be violative of the State Ethics Law provisions that the Commission found, excepting only the failure to make proper disclosures in his required annual financial reports (§ 15–507). As to those non-disclosure violations, Antonetti offered no contest before the Commission and the Court of Special Appeals.

Accordingly, I would affirm the judgment of the Court of Special Appeals.[7]

***

7. Moreover, I note the majority appears to have substituted its judgement for that of the State Ethics Commission in concluding Respondent violated § 15–506 of the Public Ethics Law. In Conclusion of Law # 5 in its Final Report and Order of 1 May 1997, the Commission *"decline[d]* to exercise [its] enforcement discretion to find Respondent in violation of this section of the Law." (Emphasis supplied). The Circuit Court did not consider the application of § 15–506. In its Memorandum and Order of Court, filed 25 February 1999, the court correctly noted that Respondent "was found not guilty of violating ... § 15–506." The Commission, in appealing to the Court of Special Appeals and in this Court, did not include § 15–506 among the statutes it found Respondent in violation of and, logically, did not seek review of its own finding that Respondent did not violate § 15–506. The applicability of § 15–506 to Respondent has been a non-issue to both Petitioner and Respondent since the Commission's Final Report and Order in 1997.