**Gen. 55]**                                                   **55**

## PUBLIC ETHICS LAW

### ZONING AND PLANNING – REGIONAL DISTRICTS – SPECIAL DISCLOSURE PROVISIONS RELATING TO PRINCE GEORGE'S COUNTY

May 26, 2015

*Michael W. Lord, Esq.*
*Executive Director*
*Maryland State Ethics Commission*

You have asked for our opinion on how to interpret certain campaign finance disclosure requirements set forth in "special provisions" of the Maryland Public Ethics Law that pertain to land use matters for the portion of Prince George's County that is located within the Maryland-Washington Regional District. Within the District, the members of the Prince George's County Council sit as the "District Council" and, in that capacity, render decisions on various types of land use applications. As we will explain below, the ethics provisions in question—Part V of the Public Ethics Law, Md. Code Ann., Gen. Prov. ("GP") §§ 5-833 through 5-841[1]—were enacted over twenty years ago in response to published reports that members of the District Council had received significant campaign contributions from the developers and other applicants who appeared before them.

Under the Part V ethics provisions, District Council members must recuse themselves from a land use matter if they have received a contribution from the applicant within a 36-month period before the filing of the application. *See* GP § 5-835(b)(1). To facilitate the recusal provision, the law also requires applicants to submit an affidavit disclosing any payments that they have made to a member of the District Council within the same 36-month period. GP § 5-835(c)(1)(i). The applicant must submit the affidavit "[a]fter an application is filed" but "at least 30 calendar days before" the District Council's "consideration of the application." GP § 5-835(c)(1), (2). Your questions relate to the timing of the affidavit requirement and the meaning of the term "consideration" for purposes of determining when an applicant must submit the affidavit.

---

[1] Unless otherwise specified, all statutory references in this opinion are to the 2014 volume of the General Provisions Article.

The timing requirements are fairly easy to administer with respect to special exceptions, zoning map amendments, variances, and other quasi-judicial land use matters, where the proceeding before the District Council is initiated by an applicant's submission of a written application that seeks an action specific to the applicant's land. In those situations, the applicant can submit the affidavit with the application, and the District Council can ensure compliance with the statute by waiting 30 days before taking up the matter. The timing requirements are more difficult to apply, however, when it comes to area master plans and sectional map amendments—quasi-legislative actions that are formally initiated by the District Council, not an applicant. In these proceedings, there is no formal "application"; instead, a person who supports a master plan or sectional map amendment with "the intent to intensify the zoning category applicable to" the person's land[2] becomes an "applicant" merely by "appearance at a public hearing, filing a statement in the official record, or [making an]other similar communication to a member of the County Council or the Planning Board." GP § 5-833(d)(3) (defining "application").

For these applicants—people who advocate for the "up-zoning" of their property by testifying during council or board proceedings—the due date for the affidavit depends on how broadly one interprets the term "consideration." If the Council "considers" a matter whenever it convenes publicly to hear testimony about it, the landowner's appearance at that hearing would simultaneously qualify his remarks as the "application" and the hearing as "consideration" of his application. If so, how can an applicant file the affidavit "after" submitting the application but 30 days "before" the council considers it? Seemingly, the only way to avoid this conundrum is to interpret "consideration" to mean a later step in the council's proceedings. That approach, however, would potentially allow a campaign donor to appear and advocate before the very council members whom he has supported financially—a result that would seem to undercut the broader purpose of the ethics provisions.[3]

---

[2]  A re-zoning that results in "the potential for a more intensive use" of a parcel is generally assumed to increase the value of the property. *See Rouse-Fairwood Ltd. P'shp. v. Supervisor of Assessments*, 120 Md. App. 667, 694 (1998). Prince George's County Zoning Ordinance lists the zoning classes in order of intensity. *See* Prince George's County Code, § 27-109(b).

[3]  At the time you submitted your request for an opinion, the District Council appears to have interpreted Part V as requiring prospective

In light of this apparent statutory ambiguity, you ask us two questions:

1.   What actions by the Council constitute "consideration" such that an applicant must file an affidavit 30 days prior to that consideration?  Specifically, does consideration occur when the Council holds a hearing on a matter that the Council will not decide until later?

2.   If an affidavit is filed inside of the 30 days of scheduled "consideration," can the application move forward even though the affidavit was not filed 30 days prior to consideration?

As to your first question, we conclude that the Council "considers" a matter when, as a body, it convenes to hear testimony or deliberate on a matter, not merely when it convenes to render a decision.  We base that conclusion on (a) the legislative history of the provision, which makes clear that the General Assembly enacted the provision to guard against corruption of the Prince George's County land use process, (b) the statutory requirement that we interpret the Ethics Law "liberally" to effectuate its intent, (c) the meaning that the Court of Appeals has given the word "consideration" in the similarly remedial Open Meetings Act, and (d) the fact that the General Assembly expressly prohibited the taking of "any action, directly or indirectly, with the intent to circumvent the intent of [Part V]," GP § 5-835(f).

With respect to your second question, we conclude that Part V does not permit the Council to move forward with an application when the applicant has failed to provide the disclosures that might disqualify a member.  Part V does not authorize the Council to grant exemptions from the filing deadline, and the land use powers granted to the County by the Maryland-Washington Regional District Act are expressly subject to Part V.  GP § 5-834.  The remedial discretion of the circuit court is also limited.  Upon a petition timely filed under § 5-839(a)(1) or on appeal of a zoning amendment under § 22-407 of the Land Use Article, the circuit court "shall issue an order voiding" a Council action taken in

---

applicants to submit their affidavits at least 30 days before the date the District Council is scheduled to hear testimony on a proposed master plan and sectional map amendment. *See* Letter from Wendy Irminger, Project Leader, Prince George's County Planning Department, to Property Owner (Feb. 7, 2013).

violation of Part V.  GP § 5-839(a)(2).  The special provisions in Part V thus do not authorize the Council to move forward with an application when an applicant has not complied with the 30-day deadline for filing the affidavit.[4]

**I**

**Background**

**A.    *Land Use Planning Within the Maryland-Washington Regional District***

The Regional District Act created the Maryland-Washington Regional District, which is made up of Montgomery County and most of Prince George's County.  Md. Code Ann., Land Use ("LU") § 20-101 (2013).  The Act delegates land use planning within the District to two "district councils," which are composed entirely of the elected officials who serve on the County Councils of the two counties.  LU § 22-101; *see Kirsch v. Prince George's County*, 331 Md. 89, 91 (1993); *Pan Am. Health Org. v. Montgomery County*, 338 Md. 214, 217 (1995); *see also* 84 *Opinions of the Attorney General* 65, 66 (1999).  Relevant to our purposes, the Prince George's County District Council is authorized to adopt and amend the text of the zoning law for Prince George's County, LU § 22-104(a), and to decide matters ranging from the approval of general and area master plans, *see Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 88-89 (2009), to special exceptions and departures from design standards.  *See County Council of Prince George's County v. Billings*, 420 Md. 84 (2011).

The District Council does not, however, make these decisions on its own.  The Prince George's County Planning Board—an unelected body—adopts certain types of plans and makes certain

---

[4]    In accordance with established policy, this Office defers to the State Ethics Commission on the interpretation of the Public Ethics Law and for that reason typically does not entertain opinion requests concerning the meaning of that law. That policy is not implicated, however, when the Commission itself seeks our aid in interpreting the Ethics Law.  We have reviewed the many advisory opinions and other Commission materials that relate to Part V, but none resolves the interpretive questions that we address here.  *See, e.g.,* State Ethics Opinions Nos. 93-16 (Dec. 15, 1993); 94-3 (July 6, 1994); and 96-2 (Jan. 31, 1996).  To the extent questions arise about how to apply the statute in specific circumstances, however, those questions should be directed to the Commission.

types of zoning decisions, which then may come before the County Council sitting as the District Council.[5]  For some of these land use matters, the District Council also participates in the process *before* the Planning Board renders its decision.  For example, the District Council initiates the process of preparing a sectional map amendment.  Also, the District Council and the Planning Board hear some planning matters jointly.[6]

**B.  Part V: The "Special Provisions" Applicable to the Prince George's County Portion of the Maryland-Washington Regional District**

Part V of the Ethics Law contains several interrelated mechanisms for limiting the influence of campaign contributors on the District Council's land use decisions.  For example, applicants and their agents are prohibited from making contributions to a member or a member's campaign while the application is pending, GP § 5-835(a), and must disclose their *ex parte* communications to a member about an application.  GP § 5-836.  The two provisions most relevant to your inquiry are the member disqualification requirement and the applicant affidavit requirement.  *See* GP § 5-835(b), (c).

**1.  The Disqualification Requirement**

A member[7] of the District Council whose campaign treasurer, continuing political committee, or slate receives a payment from an

---

[5]  *Prince George's County v. Zimmer Dev. Co*., a case now pending before the Court of Appeals, involves the standard of review to be used by the District Council in reviewing a decision of the Planning Board.  *See* 440 Md. 114 (2014) (granting certiorari).  While the reported decision of the Court of Special Appeals is informative on that review process, the case does not bear on your specific questions.  *See County Council of Prince George's County v. Zimmer Dev. Co*., 217 Md. App. 310 (2014).

[6]  For the County Council's explanation of the County's planning process, *see* http://www.princegeorgescountymd.gov/sites/CountyCouncil/Resources/Planning-DevelopmentProcess/Pages/default.aspx (last visited Feb. 27, 2015).

[7]  The term "member" is defined to "include[] any candidate or person duly elected or appointed who takes the oath of office as a member of the County Council for Prince George's County and who thereby serves on the District Council."  GP § 5-833(*l*); *see also* § 5-

applicant during the 36-month period before the applicant submits its application must refrain from participating in proceedings that involve that application:

> After an application has been filed, a member may not vote or participate in any way in the proceeding on the application if the member's treasurer or continuing political committee, or a slate to which the member belongs or belonged during the 36-month period before the filing of the application, received a payment during the 36-month period before the filing of the application or during the pendency of the application from any of the applicants or the agents of the applicants.

GP § 5-835(b)(1). The member need not recuse himself if the contribution came from a political action committee to which the applicant has made a payment, so long as the applicant made the payment "without any intent to subvert the purposes of this subtitle" and the member returns the payment to the committee.[8] GP § 5-835(b)(2).

### 2.    The Affidavit Requirement

To facilitate the member disqualification provision, the statute requires that an applicant for a land use approval file an affidavit stating whether he has made a contribution to the campaign of a Council member and, if so, to which campaign finance entity he made it:

> After an application is filed, the applicant shall file an affidavit under oath:
>
> (i)    1. stating to the best of the applicant's information, knowledge, and belief that during the 36-month period before the filing of the application and during the pendency of

---

833(f) (defining "candidate" as a "candidate for election to the County Council who becomes a member").

[8]    Part V does not affect the disclosures that campaign finance entities must make to the State Board of Elections under the Election Law Article. *See* Md. Code Ann., Elec. § 13-501 ("As to contributions to the Prince George's County Executive, a member of the Prince George's County Council, or a candidate for either of those offices, Title 5, Subtitle 8, Part V of the General Provisions Article may apply.").

the application, the applicant has not made any payment to a member's treasurer, a member's continuing political committee, or a slate to which the member belongs or belonged during the 36-month period before the filing of the application; or

2. if any such payment was made, disclosing the name of the member to whose treasurer or continuing political committee, or slate to which the member belongs or belonged during the 36-month period before the filing of the application, the payment was made[.]

GP § 5-835(c)(1). Applicants must make the same disclosure for contributions made by "a member of the applicant's household," GP § 5-835(c)(1)(iii), and must also disclose any solicitations that the applicant has made on a member's behalf and identify the member if a solicitation resulted in a contribution. GP § 5-835(c)(1)(ii). In some circumstances, the applicant's "agents" with respect to an application must also file an affidavit.[9] GP § 5-835(d). Finally, "[a] supplemental affidavit shall be filed whenever a payment is made after the original affidavit was filed." GP § 5-835(c)(3).

The affidavit requirement applies only to "individuals or business entities that would be subject to this subtitle." GP § 5-835(c)(5). Whether a person is "subject to the subtitle" is addressed in § 5-833, mostly through the definitions of "applicant" and "application."

---

[9] The affidavit requirement applies to an applicant's agent only if the agent "has acted on behalf of the applicant with regard to the specific application." GP § 5-835(d)(1)(i). If so, the agent must file an affidavit if the agent made or solicited a contribution for a member's campaign within the 36-month period before the applicant files its application. GP § 5-835(d)(1)(ii). The term "agent" includes a broad array of individuals or business entities, such as architects, attorneys, engineers, and real estate agents, "hired or retained by the applicant for any purpose relating to the land that is the subject of an application." GP § 5-833(b). An applicant "is not required" to make any representation in the affidavit about the actions "of anyone other than that applicant." GP § 5-835(c)(4).

Under § 5-833(c), a person's status as an "applicant" depends on the type of interest the person has in the "land that is the subject of the application." For example, title owners, contract purchasers, certain trustees, certain corporate directors and officers, and certain holders of "at least a 5% interest in a business entity that has an interest" in the land are "applicants"; certain lending institutions, public entities, and public utilities are not. GP § 5-833(c)(3).

An "application" is defined both by the type of land use action sought and the method by which the applicant seeks it. As to the type of action sought, an "application" includes two categories of requests for land use actions. The first category includes quasi-judicial zoning and subdivision proceedings that a person initiates by submitting a form or other materials, in the usual sense of the word "application," and that involve the person's use of a particular property. That category of applications consists of:

> (1) an application for a zoning map amendment; a special exception; a departure from design standards; a revision to a special exception site plan; an expansion of a legal nonconforming use; a revision to a legal nonconforming use site plan; or a request for a variance from the zoning ordinance;

> (2) an application to approve a comprehensive design plan; a conceptual site plan; or a specific design plan . . . .

GP § 5-833(d)(1), (2) (internal paragraph enumeration omitted). The second category of application, addressed in § 5-833(d)(3), gives rise to your question. It comprises two types of quasi-legislative planning proceedings that are initiated by the District Council: area master plans and sectional map amendments.[10] The General Assembly specified how a person is deemed to be an applicant in those proceedings by broadening "application" to include:

---

[10] For an explanation of the sectional map amendment process in the County, *see* Part 3, Division 4 of the Prince George's County Zoning Ordinance, §§ 27-220 through 27-228 of the Prince George's County Code. For an explanation of the area master plan process, *see* §§ 27-640 *et seq.* of the County Zoning Ordinance and *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 88-90. For a discussion of the quasi-legislative and quasi-judicial functions of the County Council, *see Prince George's County v. Silverman*, 58 Md. App. 41, 50-51 (1984).

> (3)   participation in adopting and approving an area master plan or sectional map amendment by appearance at a public hearing, filing a statement in the official record, or other similar communication to a member of the County Council or the Planning Board, where the intent is to intensify the zoning category applicable to the land of the applicant.

GP § 5-833(d)(3).   However one qualifies as an applicant, the affidavit must be filed with the clerk of the County Council "[a]fter an application is filed," GP § 5-835(c)(1), and "at least 30 calendar days before consideration of the application by the District Council."   GP § 5-835(c)(2); *see also* GP § 5-838(c) (generally pertaining to the clerk's duties).[11]

As to all of the statute's provisions, it is a violation for an applicant to "take any action, directly or indirectly, with the intent to circumvent the intent of this part."   GP § 5-835(f).   Other provisions in Part V provide for enforcement through civil remedies and criminal penalties, GP § 5-839, and specify that the special provisions take precedence over any conflicting County laws.   GP § 5-834.

---

[11] The Ethics Law also contains sets of "Special Provisions" for Montgomery, Howard, and Frederick counties.   Those provisions are somewhat analogous to Part V in that all require the disclosure of certain campaign contributions to the elected officials who decide particular land use matters in those jurisdictions.   For the Montgomery County provisions, first enacted in 1994, *see* Part VI (GP §§ 5-842 through 5-847; 1994 Md. Laws, ch. 645); for the Howard County provisions, first enacted in 1995, *see* Part VIII (GP §§ 5-852 through 5-856; 1995 Md. Laws, ch. 614); and for the Frederick County provisions, first enacted in 2007, *see* Part IX (GP §§ 5-857 through 5-862; 2007 Md. Laws, ch. 474). Only the Howard County provisions define "application" in such a way as to create a question about the disclosure deadline for persons who participate in proceedings that they did not initiate through the submission of a formal written application.   As to that county, where the County Executive has veto power over legislation adopted by the County Council, the Ethics Law requires that the affidavit be filed "[w]hen an application is filed," GP § 5-853(a)(1), and "at least 30 calendar days before any consideration of the application by an elected official."   GP § 5-853(b).

## II

## The Legislative History of Part V

The provisions we construe here are the result of an arduous legislative and judicial process. The first version was enacted in 1989 but was promptly declared void under the "single subject rule" of Article III, § 29 of the Maryland Constitution. *See Porten Sullivan Corp. v. State*, 318 Md. 387 (1990). A second, more stringent, version was introduced in the General Assembly's 1990 session but failed. A third version, similar to the current law in many respects, was enacted in 1992, but it, too, succumbed to a challenge under the single-subject rule. *See State v. Prince Georgians for Glendening*, 329 Md. 68 (1993). Finally, much of the current version of Part V was enacted in 1993, with further modifications made in 2011. As we will describe in some detail, each step along the way informs our understanding of the statute's purpose.

### A. *The 1989 Enactment*

The story of how the General Assembly came to adopt "special" ethics provisions for Prince George's County land use matters begins during the 1989 Session.[12] Early in the Session, the Prince George's County delegation sponsored "two uncomplicated and brief" bills concerning Prince George's County's authority to impose certain energy and transfer taxes (H.B. 889 and H.B. 890), and a third bill authorizing the imposition of development impact fees (H.B. 891). None of the bills included ethics measures, and all passed the House and were sent to the Senate. *Porten*, 318 Md. at 389-90, 393-94.

Then, in late March of that year, various newspapers reported on an unsuccessful attempt by Walter H. Maloney, the former County Attorney for Prince George's County, to disqualify five members of the County Council from voting on a zoning application filed by a developer that had contributed to their campaigns. *Id.* at 394; E. 285, 460. According to the affidavit of then-Senator Frank J. Komenda, who chaired the County delegation, the case "accentuated concerns of members of the Delegation first felt during the summer of 1988 when constituents

---

[12] Much of this legislative history comes from the record in *Porten*, which included the parties' stipulations on the progress of the legislation through the General Assembly. *See* 318 Md. at 395, n.4. Where necessary, we will cite to the pages of the record extract on file in our office, using the "E" designation required by Rule 8-503(b).

conveyed their views about perceived conflicts of interest of Council members." E. 255. Senator Komenda testified that the Maloney case had "troubled community activists" and that the Prince George's Civic Foundation "urg[ed] a legislative remedy for this problem." *Id*. In response, the Senate delegation subcommittee that Senator Komenda had appointed to address House Bills 889, 890, and 891 began to draft amendments "to address the problem." *Id*. Those amendments were added onto H.B. 890, such that "[w]hat had been essentially a one-page bill concerning 'Prince George's County—Transfer Tax' was . . . transmogrified into lengthy emergency legislation extending to 'Prince George's County Council—Ethics and Taxing Authority.'" *Porten*, 318 Md. at 395.

Meanwhile, the press continued to report on the council members' fundraising practices. On April 2, the Washington Post reported that three council members had received one-third to one-half of their contributions from development interests. E. 258, E. 329-30 (Retha Hill, Eugene L. Meyer, *Links with Developers Spotlighted by P.G. Bill; Council Members Deny Being Influenced*, The Washington Post (April 2, 1989)). On April 4, the Prince George's County Journal reported on another case in which County Council members had been asked to abstain from voting on a project proposed by a developer who had contributed to each of their campaigns. E. 258 (referring to article entitled "Abstention urged on MetroView vote").

The special ethics law, made part of H.B. 890, passed on the last day of the Session. 1989 Md. Laws, ch. 244. The new law added a subtitle 6 to the State Public Ethics Law, which was then codified in Article 40A of the Maryland Code. *See Porten*, 318 Md. at 389-90 (summarizing the law). In its broad outline, the law was similar to the provisions currently in Part V; it provided for council members to abstain from participating in land use matters where the applicant had promoted their candidacy during the preceding 36 months and required applicants to file affidavits disclosing their contributions. Former Art. 40A, § 6-603. Many of the details, however, differed. For example, the 1989 law required applicants to file their affidavit "[a]t the time an application is filed," *id*. § 6-603(b), did not define "application" to include a person's appearance at hearings on sectional map amendments, and did not address contributions made through political action committees or to a slate of candidates that included a Council member. *Porten*, 318 Md. 391, n.1. Because it was enacted as an

emergency measure, the new law took effect upon the Governor's signature on May 5. *Id*. at 389.

The 1989 legislation had an immediate impact. Even before the legislation was signed, the Prince George's Chamber of Commerce "strongly recommend[ed]" that its members exercise "caution in considering any contribution to an elected official or candidate for public office, whether at the local or state level." E. 408. The Suburban Maryland Building Industry Association ("SMBIA") "strongly recommended that *no* contributions be made to the County Executive, the County Council, or any other State or local elected official." E. 407 (emphasis in the original). In a May legislative report to its members, the SMBIA stated that, "[f]rom the standpoint of the building community, this legislation has—and will have—a favorable impact. (Fundraisers for Council members were starting to get out of hand in terms of their frequency, and our industry was very heavily lobbied to contribute)." E. 604. The report then stated, "The practice has now come to a screeching halt." *Id.*, *see also* E. 573 (discussing legislative report).

Meanwhile, the Ethics Commission was addressing questions about how, and to whom, the new law applied. In an extensive response to a publicly-traded corporation's inquiry as to the filing requirements applicable to its stockholders, employees, and related entities, the Ethics Commission noted that "there continue to be other issues regarding implementation of this law" that would require further guidance. *See* State Ethics Opinion No. 89-7 (June 20, 1989). In November, a Washington Post article noted that the campaigns of the eight council members who had filed reports had together collected only $865 after April 10, in contrast to the $237,450 they had collected in the approximately five-month period before the passage of the bill. Derald Everhart, *Ethics law puts crimp in donations*, The Prince George's Journal (Nov. 10, 1989).

The law was short-lived. On July 26, the Porten Sullivan Corporation, a developer, challenged the statute on multiple grounds, including a claim that the legislation embraced more than one subject and thereby violated the "single subject" rule of Article III, § 29 of the Maryland Constitution. *Porten*, 318 Md. at 395. Although the circuit court denied all relief, the Court of Appeals granted certiorari before proceedings in the Court of Special Appeals and, on February 6, 1990, declared the ethics portions of the statute void under the single-subject rule. *Id*. at 409.

### B. The 1990 Legislation – The Extension of the Term "Application" to Area Master Plan and Sectional Map Amendment Proceedings

Shortly after the Court issued its decision in *Porten*, the General Assembly took up consideration of a new emergency bill (S.B. 832) designed to address continuing concerns about District Council members' presiding over their campaign contributors' land use applications. Although the new bill was similar in many respects to the previous year's bill, it differed in several ways material to your question. For example, while Chapter 244 was in effect, a question had been raised about its applicability to the sectional map amendment process, which is initiated by the District Council and thus does not involve an "applicant" in the traditional sense of the word. E. 510. Senate Bill 832 proposed to resolve that question by broadening the definition of "application" to include a person's "participation in adopting and approving an area master plan or sectional map amendment by appearance at a public hearing, filing a statement in the official record, or other similar communication to a member of the County Council or the Planning Board, where the intent is to intensify the zoning category applicable to the land of the applicant." 1990 Sess., S.B. 832 (proposed Art. 40A, § 6-601(d)(3), currently codified at GP § 5-833(d)(3)). The 1990 bill also proposed to make the applicant's affidavit due "[a]fter an application is filed," "at any time prior to consideration of the application by the District Council," but "in no event . . . less than 30 calendar days prior to consideration by the District Council of the application."[13] 1990 Sess., S.B. 832 (proposed Art. 40A, § 6-602(b)(1), (2)). The bill failed.

---

[13] The legislative record also indicates that the General Assembly was considering other adjustments in response to questions raised in *Porten*. *See* Letter from Assistant Attorney General Robert A. Zarnoch to Hon. Timothy F. Maloney (Feb. 12, 1990). Those questions included whether Chapter 244 applied to contributions to slates and political action committees and to persons with minor connections to an applicant. *See Porten*, 318 Md. at 391-92, nn. 1, 2. In addition, legislators sought our Office's advice on various constitutional and other issues raised by the Court's decision in *Porten*. *See* Letters of Assistant Attorney General Robert A. Zarnoch to Hon. Joseph F. Vallario, Jr. (March 9, 1990), Hon. Timothy F. Maloney (Feb. 2 and 13, 1990), Hon. Paul Pinsky (Feb. 27, 1990), and Hon. Frank J. Komenda (March 15, 1990).

## C.  The 1991 Legislation and the Amendment of the Open Meetings Act

News reports in the bill file indicate that legislation similar to that introduced in 1990, but applicable to both Prince George's and Howard Counties, was introduced in the 1991 Session but again failed.[14]  During that session, however, the General Assembly also considered another reform measure, S.B. 170, which proposed to make quasi-judicial land use proceedings subject to the State's Open Meetings Act.  At the time, the Open Meetings Act did not apply to a public body when it was performing a "quasi-judicial" function, and decisions on applications for land use actions were generally deemed quasi-judicial.  Accordingly, many zoning boards had been deliberating behind closed doors.  *See Wesley Chapel Bluemount Ass'n v. Baltimore County*, 347 Md. 125, 141 (1997) ("The exemption in the 1977 law for quasi-judicial functions served, in effect, to permit zoning boards, boards of appeals, and other administrative agencies to continue deliberating in closed session with respect to contested case hearings.").  The change that S.B. 170 proposed gave rise to discussion as to whether a zoning board's *deliberations* on an application, in addition to its *decision*, must be carried out in public.

The bill initially proposed to clarify that the Open Meetings Act applied "to a public body when granting a license or permit or making a land use decision."  S.B. 170, 1991 Leg. Reg. Sess. (first reader).  It was then amended in committee to extend the Act's requirements to "a public body when it is meeting to *consider*:  (1) Granting a license or permit; or (2) A special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter."  *Id.* (second reader) (emphasis added).

Prince George's County and other local public bodies opposed making zoning board deliberations open to the public.  The County proposed that S.B. 170 be amended further to provide that a public body "may conduct deliberations in closed session after the closing of the record, but that the decision and the reason for the decision shall be made in open session." 1991 Sess., S.B.

---

[14] *See* Andy Markowitz, *Developers in probe generous to campaigners*, The Prince George's Journal (Jan. 24, 1992) (reporting that two delegates had introduced legislation "mirroring the 1989 measure for both Howard and Prince George's counties" but it "died in committee"); Andy Markowitz, *Fed probe brings bill back to life*, The Prince George's Journal (Jan. 31, 1992) (reporting that "[e]fforts to resurrect the [1989] law in 1990 and 1991 were defeated").

170, "Prince George's County Legislative Position" (Feb. 19, 1991). The Maryland Association of Counties commented that "this provision is dealing with quasi-judicial functions," and that, "[w]hile it is appropriate for the taking of testimony to be done in an open meeting, the deliberations of such bodies should be done in private, as are the deliberations of a jury." 1991 Sess., S.B. 170, "Memorandum to the Senate Economic and Environmental Affairs Committee" (Feb. 21, 1991). The Maryland Municipal League ("MML") also proposed amending the bill to provide that public bodies conducting the proceedings covered by the amendment be required to meet in public only when "hearing testimony." MML stated that "there should be no requirement that the deliberations of any quasi-judicial body be held in open session," and that "[d]uring these discussions candid and frank interchange is essential." Maryland Municipal League, Proposed Amendments to S.B. 170, Amendment #3 (March 26, 1991).

In response to these local government concerns, an amendment was offered to the committee that would have required a public body to meet in public only when "hearing testimony regarding" a land use matter and not, as the bill then read, when "meeting to *consider*" such a matter. The amendment was rejected. An undated and anonymous handwritten note in the bill file reflects one committee's consideration of the amendment and records the committee's view that the open meetings bill was an alternative to the Prince George's County ethics bill:

> Amendment was offered to workgroup and to full Committee. Amendment was rejected.
>
> Committee intends to cover deliberations concern[ing] licenses, permits, and zoning. Decisions are to be based on the public record & therefore saw no reason for discussion of the public record to occur behind closed doors. . . . *Also the current perception about local zoning processes was of concern to the Committee and it believed that opening these meetings would go a long way to combatting the negative perceptions & a better 1st approach than P[rince] G[eorge's] Public Ethics bills, or similar efforts.*

1991 Sess., S.B. 170, Amendment (Apr. 4, 1991) (emphasis added).[15] The bill file reflects that the amendment was later introduced as a floor amendment and again was rejected.

The General Assembly passed S.B. 170, and the Governor signed it into law. *See* 1991 Md. Laws, ch. 655. Now codified at GP § 3-103(b)(2), the provision makes the Open Meetings Act expressly applicable to a public body when it is "meeting to consider: . . . a special exception, variance, conditional use, or zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter." In using the word "consider," the General Assembly was using a term that it had already used in the Open Meetings Act and that the Court of Appeals had already construed, for purposes of that law, as including "the deliberative and decision-making process in its entirety." *New Carrollton v. Rogers*, 287 Md. 56, 72 (1980).

### D. The 1992 Enactment

"Negative perceptions" about Prince George's County land use proceedings again came to the General Assembly's attention in 1992. Early in that session, the Washington Post reported that a federal grand jury had subpoenaed the County's zoning records relating to those developers who had been "among the biggest financial contributors to County Council campaigns" and the financial disclosure forms of all members of the Council since 1986. Michele L. Norris and Paul Duggan, *P.G. Probe Eyes Top Developers; Land-Use Inquiry Targets Council's Ties to Businessmen*, Washington Post (Jan. 23, 1992). The article stated that the investigation had begun "almost two years ago, when civic groups began publicly complaining of allegedly corrupt land deals and calling for a full investigation by the U.S. attorney's office in Baltimore." *Id.* Citing a "federal law enforcement source," the article reported that FBI agents assigned to the case had gathered "'a lot of intelligence' about the connections among developers,

---

[15] Although some commentators have described such undated and anonymous notes as "inherently dubious," *see* Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 453 (1995), the Maryland appellate courts sometimes use such materials to discern legislative intent. *See id.* (citing *Webber v. State*, 320 Md. 238, 247 (1990), *Franklin Square Hosp. v. Laubach*, 318 Md. 615, 621-22 (1990), and *Warfield v. State*, 315 Md. 474, 497-98 (1989)); *see also McNeil v. State*, 112 Md. App. 434, 452 n.9 (1996) (relying on "undated, handwritten notes" contained in the legislative committee's working papers).

zoning lawyers and current and former council members." *Id*. Another article in the bill file quoted the Senate President as stating that the offices of the members of the County delegation had been "besieged with calls from constituents . . . requesting that legislation be introduced again" and that the delegation would meet to consider re-introducing a county ethics bill. David Sokolik and Maria Douglas, *Reviving ethics law considered in wake of constituents' calls*, The Prince George's Journal (Jan. 24, 1992).

In response, the Prince George's County Senate delegation sponsored an ethics bill, S.B. 701, which would have imposed affidavit requirements and deadlines that were substantially the same as those that appear in the current law. Senate Bill 701 passed the Senate but died in the House.

The Senate then amended H.B. 937—an unrelated piece of legislation addressing Montgomery County planning and zoning matters—to include the text of S.B. 701. The House passed the amended legislation on the last day of the session and, on May 29, 1992, the Governor signed it into law. 1992 Md. Laws, ch. 643.

The life of Chapter 643 was even shorter than that of Chapter 244 of the 1989 laws, and it ended the same way. Two days after Chapter 643 took effect, the County Executive, a committee supporting his gubernatorial campaign, and two individuals filed a declaratory judgment action seeking a declaration that the law violated the single-subject rule. This time, the circuit court agreed and declared the ethics provisions severable and void. The Court of Appeals, again taking the case before the Court of Special Appeals heard it, affirmed that judgment on January 12, 1993, one day before the General Assembly convened its 1993 Session. *State v. Prince Georgians for Glendening*, 329 Md. 68 (1993).

### E.    *The Law Takes Its Current Form*

Lasting ethics legislation for Prince George's County was finally enacted in the 1993 session. The measure was introduced as H.B. 989, passed by the General Assembly, and signed by the Governor. *See* 1993 Md. Laws, ch. 577. In most respects, the 1993 legislation established the present contours of the law; it contained the same affidavit requirement, the same disqualification obligation, and the same timing provisions that we construe below. Two aspects of the current law were added in 2011, again in response to reports of corruption in Prince George's County. Two months before the General Assembly convened for that session, the

press reported the arrest of the outgoing County Executive and his wife—a newly-elected Council member—on charges related to his receipt of payments from developers and her tampering with and destroying evidence. *See, e.g*., Paul Schwartzman, Ruben Castaneda, and Cheryl W. Thompson, *Jack Johnson, Prince George's county executive, and his wife, Leslie, arrested*, The Washington Post (Nov. 13, 2010). In February, 2011, Mr. Johnson was indicted on extortion and bribery charges related to his alleged receipt of more than $200,000 from developers starting in 2003. *See, e.g.*, Associated Press, *Former Prince George's County exec Jack Johnson pleads not guilty in case*, The Daily Record (March 15, 2011).

Meanwhile, Mr. Johnson's newly-elected successor and the County's delegation began working on legislative proposals. After considering a recommendation that the County Council members be stripped of all development review powers, the delegation instead agreed to introduce a bill to strengthen the State Ethics Law and the County Ethics Commission and curtail the County Council's ability to delay development deals. *See, e.g.*, Miranda S. Spivack, *Bill would end 'pay to play' in Prince George's County*, The Washington Post (March 16, 2011) (reporting that "[t]he bill stems in part from longtime complaints that past councils have operated secretively, threatening developers that their plans would be held up indefinitely unless they offered concessions or hired an associate of a council member").

The legislation that emerged, and was enacted, made two changes to what is now Part V. *See* 2011 Md. Laws, ch. 91. The first change strengthened the disqualification requirement. At the time, the provisions that now comprise Part V only disqualified a member from voting or participating on a matter if an applicant or agent had filed an affidavit "naming the member or the member's continuing political committee as the recipient of a payment." Md. Code Ann., State Gov't ("SG"), § 15-831(b)(2)(i) (2009 Repl. Vol.); *see also State Ethics Opinion* 96-02 (concluding that a member's receipt of actual notice, through an interested party's introduction of evidence into the record of the land use proceeding, would not disqualify the member). Chapter 91 deleted the filing of the affidavit as the trigger for the disqualification requirement with the result that the member's duty no longer hinges entirely on the applicants' compliance with the affidavit requirement. GP § 5-835(b)(1). The second change broadened the definition of "payment" and other provisions in Part V to include contributions to a slate to which a member belonged. GP §§ 5-833(m), 5-835.

Finally, in 2014, the relevant statutory provisions were recodified and transferred from Part IV of Title 15 of the State Government Article to its current place in Title 5 of the newly-created General Provisions Article. 2014 Md. Laws, ch. 94. During that process, the code revision committee made a number of presumptively non-substantive wording changes to the statute, including the affidavit and disqualification provisions we address here. The most notable change occurred in the provision that governs the timing of the affidavit requirement. Prior to recodification, § 15-831(c)(2) of the State Government Article provided:

The affidavit may be filed any time prior to consideration of the application by the District Council, at the discretion of the applicant. However, in no event may the affidavit be filed less than 30 calendar days prior to consideration by the District Council of the application.

As it now appears in Part V, the timing provision states: "The affidavit shall be filed at least 30 calendar days before consideration of the application by the District Council." GP § 5-835(c)(2). The Revisor's note explains that "the former reference to filing the affidavit 'any time prior to consideration . . . at the discretion of the applicant' [wa]s deleted as surplusage." *Id.* (ellipsis in original).

### III

### Analysis

#### A. *Calculating the Affidavit Filing Deadline*

Your first question requires us to address two subsidiary questions related to area master plan and sectional map amendment proceedings: (1) At what point does the District Council's "consideration" of a person's application begin?; and (2) If a person "applies" by testifying at a hearing at which the District Council is deemed to be "considering" that application, when must that person file the affidavit about campaign contributions?

#### 1. When "Consideration" Occurs

The Ethics Law does not define the word "consideration," and the appellate courts have not addressed its meaning for purposes of Part V. The General Assembly has instructed, however, that all but the criminal sanctions provisions of the Ethics Law must be

"liberally construed" to accomplish the purpose behind the law. GP § 5-102(c). The statute makes that purpose explicit. After declaring that public "confidence and trust is eroded when the conduct of the State's business is subject to improper influence or even the appearance of improper influence," the General Assembly stated:

> For the purpose of guarding against improper influence, the General Assembly enacts this Maryland Public Ethics Law to require certain government officials and employees to disclose their financial affairs and to set minimum ethical standards for the conduct of State and local business.

GP § 5-102(b); *see also Carroll County Ethics Comm'n v. Lennon*, 119 Md. App. 49, 71 (1998) (describing the Legislature's "clear intent" that the State Ethics Law be "liberally construed to accomplish this purpose"); 99 *Opinions of the Attorney General* 171, 186 (2014).

More generally, the Court of Appeals instructs us to "ascertain and effectuate the real and actual intent of the Legislature." *Maryland Econ. Dev. Corp. v. Montgomery County*, 431 Md. 189, 199 (2013) (citation and quotation marks omitted) ("*MEDCO*"). We "begin[] with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Id.* (citation and quotation marks omitted); *see also Blue v. Prince George's County*, 434 Md. 681, 689 (2013) (statutory language is "typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity"). The goal of statutory interpretation "is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision." *People's Ins. Counsel Div. v. Allstate Ins. Co*., 408 Md. 336, 351 (2009) (internal quotation marks omitted). In the end, the language "should be construed to carry out and effectuate, or aid in, the general purposes and policies of the statute being interpreted." *MEDCO*, 431 Md. at 199 (citation and internal quotation marks omitted).

Our discussion thus begins with the ordinary meaning of "consideration." In determining a word's "ordinary meaning," the Court of Appeals often turns to a dictionary and has done so when construing undefined terms within the Ethics Law. *See State Ethics Commission v. Antonetti*, 365 Md. 428, 452 (2001) (construing the term "participate" in what is now GP § 5-501); *see also, e.g., Blue*,

434 Md. at 690 (turning to "[c]ommon dictionary definitions" when the "statute itself does not provide a specific definition"). The 1989 edition of Webster's Ninth Collegiate Dictionary defines "consideration" as "continuous and careful thought," as in, "after long consideration he agreed to their requests." The 1984 edition of Webster's New World Dictionary defines "consideration" as "1. The act of considering; deliberation."[16] These definitions do not confine the word to any particular stage of deliberation; they encompass the entire process.

The dictionary definition of the term "consideration" comports with the Court's understanding of the word as used in the Open Meetings Act. *See New Carrollton*, 287 Md. 56. The *New Carrollton* Court, noting that the act "covers all meetings at which a quorum of the . . . public body is convened 'for the purpose of considering or transacting public business,'" stated:

> It is, therefore, the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business.

*Id.* at 72 (referring to a provision now codified at GP § 3-101(g)[17]); *see also College Park v. Cotter*, 309 Md. 573, 585 (1987) (quoting *New Carrollton*). Likewise, the ordinary definition of "consideration" comports with the way the General Assembly used the word in 1991, when it addressed the "negative perceptions" about local zoning processes by amending the Open Meetings Act to require a public body to meet openly when it is "meeting to

---

[16] Black's Law Dictionary, often consulted by the Court, *see, e.g.*, *Stoddard v. State*, 395 Md. 653, 669 (2006) (consulting that dictionary for an "ordinary, popular" meaning of a word), defined the noun "consideration" only by reference to its usage in contracts law. Black's Law Dictionary (6th ed. 1990). Black's defined the verb "to consider" in its ordinary sense as: "To fix the mind on, with a view to careful examination; to examine; to inspect. To deliberate about and ponder over. To entertain or give heed to." *Id.*

[17] Under the Open Meetings Act, "meet" now means "to convene a quorum of a public body to consider or transact public business." GP § 3-101(g).

consider" zoning matters, not just when it votes on them. *See* 1991 Md. Laws, ch. 655.[18]

We turn next to whether the ordinary meaning of "consideration" effectuates the Legislature's intent, or, conversely, results in absurd and presumably unintended consequences. *See, e.g., Blue*, 434 Md. at 689 (stating that "the consequences of alternative readings" should be evaluated and absurd consequences avoided). One potentially illogical consequence of interpreting "consideration" to include the hearing at which the applicant-contributor initially appears emerges quickly in the quasi-legislative context: How can an applicant file the affidavit "[a]fter an application has been filed" (GP § 5-835(c)(1)) but 30 days "before" the council considers it (GP § 5-835(c)(2)) if the application and consideration occur simultaneously? The interplay of these two timing provisions would seem to compel the conclusion that "consideration" of area master plans and sectional map amendments must mean a later step in the council's proceedings, whether that be a subsequent hearing or the actual *decision* on the application.

Although reading "consideration" to mean a later step in the deliberative process would seem to preserve the logic of the statute's timing provisions, it has other limitations that weigh against it. First, that reading would assume that the Legislature intended to assign greater deliberative significance to one hearing over another. We see no evidence of such intent or even a logical basis on which to make such a distinction. Equating "consideration" with "*decision*" might make logical sense, but it would seem to be inconsistent with § 5-837, which uses another term—"final action"—for the ultimate disposition of the application. More importantly, an interpretation of "consideration" that allows a Council member to attend a hearing at which a

---

[18] For one commentator's description of the 1991 amendment of the Open Meetings Act as a way of promoting integrity in land use processes, *see* Philip J. Tierney, *Bold Promises But Baby Steps: Maryland's Growth Policy to the Year 2000*, 23 U. Balt. L. Rev. 461, 520, n.48 (1994) ("The element of greed is . . . a factor sometimes present in the land use regulatory process as illustrated by Maryland's periodic history of political corruption by local zoning officials that prompted the state legislature and the courts to adopt a number of reforms that include among other requirements: open meetings, Md. Code Ann., State Gov't §§ 10-501 to 10-512 (1993 & Supp. 1994); public ethics and financial disclosure requirements, Md. Ann. Code art. 40A, §§ 1-101 to 7-104 (1993 & Supp. 1994); and adjudicatory safeguards . . . .").

campaign donor advocates in support of his application cannot be squared with other provisions of the statute or with its broader public policy goal of limiting the influence of campaign contributions on the County's land use process. The statute provides that a council member "may not vote or participate in any way" in a proceeding involving a contributor's application. GP § 5-835(b)(1). Although the term "participation" is not defined in the statute, the Court of Appeals has construed that term, in another section of the Ethics Law, to mean "to have or take a part or share with others (in some activity, enterprise, etc.)." *Antonetti*, 365 Md. at 452 (adopting the definition in Webster's New World College Dictionary in construing the requirement that an official may not "participate" in a matter if a relative has an interest in the matter). By that standard, a council member's presence during his contributor's testimony would constitute "participation" in the proceedings.[19]

In our opinion, the statute's policy goal—limiting the influence of campaign contributions on the County's land use process—would be undermined if the affidavit deadline were to be interpreted to allow a Council member to be present during a contributor's presentation. The General Assembly sought not only to restrict influence, but also to improve public confidence in the integrity of the land use process by eliminating even "the *appearance* of improper influence." GP § 5-102(a)(2) (emphasis added). That larger goal, too, would be undermined by giving the conflicted Council member a place at the table regardless of whether he overtly influences the Council's deliberation. A member could influence, or appear to influence, his colleagues' position on his contributor's proposal in any number of ways during the hearing, whether by making comments, asking

---

[19] We recognize that the language of § 5-835(b)(1) suggests that the disqualification provision applies only "[*a*]*fter* [a contributor's] application has been filed," which could be read as authorizing the council member to participate *while* that application is being filed. As discussed above, these timing provisions seem to have been drafted for the type of traditional application that is submitted in a quasi-judicial proceeding, where the Council's consideration would only come after the application is submitted. *See supra* at 2. In that context, giving effect to the timing provision in § 5-835(b)(1) makes sense. We believe it makes considerably less sense when read in the context of proceedings on an area master plan or sectional map amendments, which are quasi-legislative actions that are initiated in ways other than the filing of a traditional application.

questions, or even just seeming to convey his approval or disapproval of particular witnesses' testimony. The potential for that influence could be magnified in a jurisdiction like Prince George's County, where elected officials serve by district, rather than at large. In those circumstances, "councilmanic courtesy" can give decisive weight to an official's views on a proposal involving the official's home district.[20]

The principles that guide the interpretation of statutes thus suggest a broad construction of the term "consideration." A broad construction effectuates legislative intent, comports with the General Assembly's direction that the Ethics Law "be liberally construed," GP § 5-102(c), and gives this remedial statute the construction necessary "to suppress the evil and advance the remedy." *See Lark v. Montgomery Hospice, Inc*., 414 Md. 215, 228 (2010). In this regard, we note the observation of the Court of Appeals that the need for the enforcement of ethics laws is "'perhaps even more acute . . . at the local government level, where the government and its citizens have greater contact with one another.'" *Antonetti*, 365 Md. at 447-48 (addressing the conduct of an employee of local board of elections, a State agency, quoting *Lennon*, 119 Md. App. at 61). If anything is clear from the long legislative history of this statute, it is the General Assembly's repeatedly-demonstrated concern about the erosion of public confidence in the County's land use process brought on by repeated reports of abuse. It thus makes sense—and does not lead to absurd consequences—to read the affidavit deadline in such a way as to disqualify Council members from their contributors' land use applications in time to prevent them from participating in *any* phase of the Council's deliberation.

To summarize, we believe that a narrow interpretation of "consideration" to exclude the early stages of the District Council's

---

[20] "In some large cities land-use decisions are determined by a system of 'councilmanic courtesy': all members of the elected governing body informally agree to follow the decision of the member from the district where the land-use problem has arisen." David Schleicher, *City Unplanning*, 122 Yale L.J. 1670, 1710 (2013) (quoting Robert C. Ellickson, *Suburban Growth Controls: An Economic and Legal Analysis*, 86 Yale L.J. 385, 408 n.60 (1977)). The practice is related to "local courtesy," which is "an unwritten, commonly observed custom where the members of both the House and the Senate of the General Assembly defer to the representatives of a particular jurisdiction, i.e. a county's local legislative delegation, on matters affecting only that district." *Getty v. Carroll County Bd. of Elections*, 399 Md. 710, 724-25 n.13 (2007).

proceedings, whether in a meeting or by other action of that body, would weaken the disqualification requirement, run counter to the General Assembly's likely understanding of the word when it enacted the law, and conflict with the statutory requirement that the Ethics Law be construed "liberally" to achieve its purposes. Given the shared purpose of Part V and the Open Meetings Act to enhance public faith in government through disclosure requirements, and the General Assembly's consideration of both laws as a way of addressing the influence of campaign contributions on the District Council's land use decisions, we believe that the *New Carrollton* definition of "consideration" applies here. In our opinion, then, "consideration" for purposes of Part V means the Council's "deliberative and decision-making process in its entirety." *See New Carrollton*, 287 Md. at 72.

### 2. When the Affidavit Must Be Filed

We turn now to the more practical question of when, given our conclusion above, the applicant must submit his or her affidavit. Again, the statute contains two provisions that bear on the issue: § 5-835(c)(1), which requires that the applicant file the affidavit "[a]fter an application is filed," and § 5-835(c)(2), which requires that the affidavit be filed "at least 30 calendar days before consideration of the application by the District Council." When an applicant who has contributed to a member's campaign applies only by testifying at a hearing, these two provisions conflict: the first would seem to allow the applicant to file the affidavit *after* testifying, while the second would require him to file it at least 30 days *before* testifying.

The only way to achieve the timely disqualification of the member from the proceeding is to require the applicant to file the affidavit before the hearing. So, given the choice between the two timing provisions, the provision that requires that the affidavit be filed "at least 30 calendar days before consideration of the application," GP § 5-835(c)(2), best effectuates the Legislature's intent that District Council members be timely barred from participating in, and voting on, their contributors' land use matters. This conclusion is clearer still from the wording of the timing provision prior to its recodification in 2014:

> The affidavit may be filed any time prior to consideration of the application by the District Council, at the discretion of the applicant. However, *in no event* may the affidavit be

> filed less than 30 calendar days prior to consideration by the District Council of the application.

Former SG § 15-831(c)(2) (emphasis added); *see also Allen v. State*, 402 Md. 59, 71-72, (2007) (observing that the "[r]ecodification of statutes is presumed to be for the purpose of clarity rather than change of meaning"). In our view, the legislative intent behind Part V would not be served by enabling an applicant to delay a council member's disqualification by waiting to file the affidavit until after the hearing on whether to re-zone the planning area in which the applicant's land lies. *See* GP § 5-835(f) (prohibiting an applicant from taking "any action, directly or indirectly, with the intent to circumvent the intent of this part").

We reach the same result by applying the formalistic rule that when two provisions in a statute conflict, the more specific prevails over the more general. *See, e.g., A. S. Abell Pub. Co. v. Mezzanote*, 297 Md. 26, 40 (1983) ("Ordinarily, a specific enactment prevails over an incompatible general enactment in the same or another statute."). Section 5-835(c)(1) focuses on the content of the affidavit and addresses timing only in a generally-worded preface to its detailed description of the disclosures to be made. By contrast, § 5-835(c)(2) focuses *only* on timing. Given the structure of the section and the emphasis given to the 30-day provision in its earlier form, we believe that § 5-835(c)(2)—"at least 30 calendar days before consideration of the application"—provides the operative deadline.[21]

In construing Part V, we have referred only to State law; our interpretation of what it means for the District Council to "consider" an application does not hinge on the procedures the Council has established by ordinance. We have done so because the General Assembly expressly provided that the County must carry out the land use powers granted to it by the Regional District Act "in accordance with" the Special Provisions, "[n]otwithstanding any other provision of law." GP § 5-834. Moreover, an uncodified section of Part V provides that "this Act:

---

[21] As noted above, there are similarities between the affidavit filing deadlines in the Howard County and Prince George's County ethics provisions. *See supra* note 11. Although that might suggest that the conclusions we reach here can be applied in Howard County as well, we cannot rule out the possibility that the meaning of the term "consideration" might vary with the circumstances of each county's "special" provisions. We do not mean to foreclose that possibility here; we construe only the Prince George's County provisions.

(1) Supersedes any Prince George's County ordinance dealing with subjects covered by this Act; and (2) May not be supplemented by any Prince George's County ordinance." 1993 Md. Laws, ch. 577, § 4; *see also, e.g., County Council of Prince George's County v. Brandywine Enters.*, 350 Md. 339, 346 (1998) (observing that "any enactment concerning zoning in the county, which is at variance with the Regional District Act, is inoperative within the district") (citation and internal quotation marks omitted); *Northampton Corp. v. Prince George's County*, 273 Md. 93, 96 (1974) (same).

Accordingly, a person who supports the up-zoning of property in which he has an interest must file the contribution affidavit 30 days before any stage of the District Council's deliberation on the matter, no matter how that person chooses to "apply." For example, if a landowner "applies" by asking a Council or Planning Commission member to initiate the process for a sectional map amendment that would up-zone the landowner's property, the landowner must file his affidavit 30 days before the District Council, as a body, addresses whether to initiate the process. Likewise, a landowner who wishes to "apply" by appearing at a District Council hearing on the matter must file the affidavit 30 days in advance of the hearing.

We understand that, under this interpretation, a person who wants to participate only by speaking at a hearing before the District Council must form that intention in time to file an affidavit 30 days in advance. We read the statute as requiring that level of foresight because the Ethics Law expressly requires that the County's land use powers "shall be carried out in accordance with" Part V. *See* GP § 5-834. In other words, the County must adapt its land use decision-making process to accommodate the requirements of Part V, not the other way around. The County must therefore give landowners adequate notice of upcoming proceedings that might affect their property, and landowners who want their land up-zoned during those proceedings must plan accordingly.

**B.** **Whether an Application "Can Move Forward" when an Applicant Has Failed to File the Required Affidavit 30 Days Before the Council Meets to Consider the Application**

In our view, the Council lacks the power to proceed with the application of a person who has failed to timely file the required affidavit. Although Part V does not explicitly provide as much, we

believe the District Council is not authorized to proceed in the face of an applicant's or agent's violation of Part V.

The Council does not have inherent zoning powers; instead, it has only those powers that the State has granted it. *See Montgomery Pres., Inc. v. Montgomery County Planning Bd. of the Maryland-National Capital Park & Planning Comm'n*, 424 Md. 367, 377 (2012) ("The Council can only exercise its powers under the statute to the extent and in the manner directed by the legislature"). As to the Prince George's County land within the Maryland-Washington Regional District, those powers are granted by the Regional District Act. *See Brandywine*, 350 Md. at 346 (observing that "the Regional District Act is the exclusive source of zoning authority in those areas of Prince George's County located within the Regional District"). Section 22-206(b) of the Land Use Article, which authorizes the District Council to adopt certain procedures, does not list the ethics deadlines as one of the procedures the District Council may alter. Moreover, as we noted in the preceding section, the District Council may only exercise its Regional District Act powers "in accordance" with Part V. GP § 5-834. In our view, it would not accord with Part V for the District Council to consider the applications of landowners who have violated the affidavit requirement, especially as the efficacy of the disqualification requirement hinges largely on compliance with the affidavit requirement. *See, e.g.,* GP § 5-839(b)(3) (providing that a member "is guilty of violating this part only if the member fails to abstain from voting or participating in a proceeding, based on information contained in an affidavit").

The importance of strict compliance with the affidavit requirement is also reflected in the judicial review provisions of the statute, which mandate that the circuit court "*shall* issue an order voiding an official action taken by the County Council if . . . the action taken by the County Council was in violation of this part." GP § 5-839(a)(2) (emphasis added). In short, "any enactment concerning zoning in the county, which is at variance with the Regional District Act, is inoperative within the district." *Brandywine*, 350 Md. at 346 (citation and internal quotation marks omitted).

Finally, we note that nothing in Part V gives the District Council the discretion to grant extensions or exceptions to the statutory deadlines for the various disclosures that Part V requires. Affidavits and the other disclosures required by the statute are to be filed with the clerk of the County Council, who is to act under the "direction and control" of the State Ethics Commission and its Executive Director. GP § 5-838(a), (c); *see also* GP § 5-101(k)

(defining "Ethics Commission" to mean the State Ethics Commission). The clerk "may only" perform four tasks: receive filings, maintain records, report violations, and perform "other ministerial duties necessary to administer this part." GP § 5-838(a). One of those "other ministerial duties" is putting the affidavits in the appropriate case files; another is submitting a "summary report" that compiles the affidavits and disclosures. GP § 5-838(c). The Council clerk's duties thus resemble those of a District or circuit court clerk; neither has the authority to extend deadlines set by rule or law. *See, e.g., Mutual Ben. Soc. of Baltimore, Inc. v. Haywood*, 257 Md. 538, 541 (1970) (court officials' actions "must conform to the practices as defined in the Maryland Rules of Practice and Procedure"); *see also re Kaela C.*, 394 Md. 432, 471-72 (2006) (because filing deadlines in the Maryland Rules are "precise rubrics," circuit court erred by adopting the master's recommendations before the five-day period for filing exceptions had expired).

We thus conclude that the Council may not proceed with an application when the applicant has not complied with Part V. Although the consequences of proceeding in the absence of affidavits will depend on the specific facts of the Council's decision, we agree with the Ethics Commission that an applicant's failure to file a timely affidavit would raise "serious questions" about the validity of the Council's action. *See* Memorandum Re: Prince George's County Zoning Ethics, Disclosure Participation and Contributions Provisions—Md. Code Ann., General Provisions §§ 5-833 – 5-839, at 4 (Oct. 1, 2014). For example, in 2012, the Circuit Court for Prince George's County struck down the portions of a 2009 sectional map amendment that related to properties for which affidavits were required but had not been filed. *See Accokeek, Mattawoman, Piscataway Creeks Communities Council v. County Council of Prince George's County, Maryland, sitting as the District Council*, CAL Nos. 09-31402 and 09-32017, Memorandum and Order of Court (Pr. G. Cty. Cir. Ct. Sept. 7, 2012). The court ordered that those properties were to "retain their original zones prior to the [amendment]." *Id*. at 5, 8.

How to implement the statute so as to avoid such consequences will depend on factual circumstances that the District Council is better able to anticipate than we are. That said, several general approaches suggest themselves. It is our understanding, for example, that the District Council already informs potential applicants to submit their affidavits at least 30 days prior to the scheduled hearing date at which they intend to testify. *See supra*

n.3.  The Council might also wish to reiterate, at the opening of testimony, that applicants will not be allowed to testify unless they have filed a timely affidavit.  And if an applicant's failure to file an affidavit becomes apparent only later in the proceeding, *Accokeek* would seem to suggest that the Council should remove the applicant's property from consideration and postpone any future consideration of it until after a timely affidavit has been filed.  We only suggest these; what approach suits a particular set of circumstances is best addressed by the Council in accordance with the Ethics Commission's guidance.

## IV

### Conclusion

In our opinion, the Prince George's County District Council's "consideration" of an application for purposes of Part V of the Public Ethics Law occurs whenever the District Council, as a body, addresses the matter, whether or not the District Council intends to act on it at that time.  Further, the Council may not move forward with an application if an applicant has failed to file the necessary affidavit at least 30 calendar days before the matter comes before the District Council.  The Ethics Law does not grant to either the District Council or the clerk of the County Council the discretion to change the filing deadline or excuse applicants and agents from it.

> Brian E. Frosh
> Attorney General of Maryland
>
> Adam D. Snyder
> Chief Counsel, Opinions
>  & Advice

* Jeffrey G. Middleton, a former intern in this office, assisted in the preparation of this opinion.